**ROSIE D. et al., Plaintiffs,**

v.

**Mitt ROMNEY et al., Defendants.**

**No. CIV.A.01–30199–MAP.**

United States District Court,
D. Massachusetts.

Jan. 26, 2006.

James C. Burling, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, Cathy E. Costanzo, Center for Public Representation, Northampton, MA, Gabrielle E. Foote, New York, NY, John Sup Rhee, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, Frank J. Laski, Mental Health Legal Advisors Committee, Boston, MA, Samantha J. Morton, Hale & Dorr, LLP, Boston, MA, Steven J. Schwartz, Center for Public Representation, Northampton, MA, Sara Jane Shanahan, Griesinger, Tighe & Maffei, LLP, Boston, MA, for Anton B., Chelsea T., Chris T., Christine Q., Danielle H., Devin E., Forrest W., Jason S., Jerry N., Jose M., Joshua D., Kristin P., Marc St. L., Natisha M., Ralph B., Rosie D., Samuel L., Sarah B., Shaun E., Sheena M., Shentelle G., Terrence M., Tevin W., Tyriek H., Nathan F., Plaintiffs.

Daniel J. Hammond, Attorney General's Office, Boston, MA, Bart Q. Hollander, Attorney General's Office, Springfield, MA, Timothy M. Jones, Mass. Attorney General's Office, Springfield, MA, Stephanie S. Lovell, Attorney General's Office, Boston, MA, Deirdre Roney, Attorney General's Office, Boston, MA, John R. Hitt, Attorney General's Office, Boston, MA, Juliana deHaan Rice, Attorney General's Office, Boston, MA, Adam Simms, Deutsch Williams, Boston, MA, for EOHHS, Eric Kriss, Janice B., Robert Gittens, Stephen P. Crosby, Wendy E. Warring, Jane M. Swift, Governor Mitt Romney, Ronald Preston, Defendants.

## MEMORANDUM OF DECISION

PONSOR, District Judge.

### I. INTRODUCTION

On July 30, 1965, the citizens of this country, through the enactment of the Medicaid Act, Pub.L. 89–97, 79 Stat. 343, committed themselves to providing certain basic medical services to millions of low-

income Americans. On December 19, 1989, Congress restated and deepened its commitment to eligible children by amending the Medicaid statute to promise that persons under twenty-one years of age would receive *all* reasonably necessary medical care regardless of ability to pay. From today's perspective, the scope of this commitment seems breathtaking: no Medicaid-eligible child in this country, whatever his or her economic circumstances, will go without treatment deemed medically necessary by his or her clinician.

The 1989 amendment made the provision of particular services a mandatory part of each state's Medicaid program. With special relevance to this case, the amended statute called for "early and periodic screening, diagnostic, and treatment services" (so-called "EPSDT" services) for all eligible children.

This lawsuit challenges whether the Commonwealth of Massachusetts, a conceded Medicaid participant, has kept the promise made by Congress to America's children. Specifically, it charges that Defendants have failed to provide medically necessary EPSDT services to persons who might be described as the neediest of the needy: children suffering from serious emotional disturbances ("SED") such as autism, bi-polar disorder, or post-traumatic stress disorder. Plaintiffs contend that as a result of Defendants' violation of the Medicaid statute, thousands of disabled low-income children continue to suffer needlessly.

On October 31, 2001, Plaintiffs filed their complaint, alleging violations of four specific provisions of the Medicaid Act: the EPSDT provisions, 42 U.S.C. §§ 1396a(a)(10)(A), -(a)(43), 1396d(r)(5), -(a)(4)(B)(2005) (Count I); the "reasonable promptness" provision, § 1396a (a)(8) (2005) (Count II); the methods of administration or "equal access" provision, § 1396a(a)(30)(A) (2005) (Count III); and the managed care provision, § 1396u–2(b)(5) (Count IV).

The suit named various state officials and agencies as defendants[1] (referred to variously as "Defendants" or "the Commonwealth"): Mitt Romney, the Governor of Massachusetts; Eric Kriss, the Secretary of the Executive Office of Administration and Finance; Ronald Preston, the Secretary of the Executive Office of Health and Human Services (EOHHS); Robert H. Weber, Guardian ad Litem; EOHHS; and the Massachusetts Division of Medical Assistance.

On December 19, 2001, Defendants filed a motion to dismiss, contending, among other things, that the Eleventh Amendment granted them immunity from suit. Two days later, on December 21, 2001, Plaintiffs moved for certification of a class.

On March 29, 2002, the court denied the motion to dismiss and certified a class of all current and future Medicaid-eligible children in Massachusetts under twenty-one years of age, who were (or might become) eligible to receive, but were not receiving, what Plaintiffs described as "intensive home-based services."

Defendants pursued an interlocutory appeal of the court's denial of their motion to dismiss. On November 7, 2002, the Court of Appeals for the First Circuit affirmed this court's ruling, holding that "Eleventh Amendment immunity does not protect state officials from federal court suits for prospective injunctive relief under the Medicaid Act." *Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 238 (1st Cir.2002).

---

**1.** Between the time Plaintiffs filed this lawsuit in 2001 and the date the suit went to trial in April 2005, a new administration took over the governor's office. Thus, some parties were terminated and others added. The names specified in this memorandum were the defendants at the time of trial.

On March 25, 2005, the court allowed the parties' joint motion to dismiss Count IV, without prejudice. Non-jury trial with regard to liability on the three remaining counts took place from April 25, 2005, to June 9, 2005. On August 9, 2005, following submission of extensive proposed findings of facts and conclusions of law by the parties, the court heard closing arguments and took the matter under advisement.

For the reasons set forth below, the court finds that Plaintiffs have proved, by far more than a fair preponderance of the evidence, that Defendants have failed to comply with the EPSDT and "reasonable promptness" provisions of the Medicaid Act. Plaintiffs are therefore entitled to judgment with regard to liability on Counts I and II of their complaint; the court will consider prospective injunctive relief pursuant to the schedule set forth at the end of this memorandum. As for Count III, the claim under the equal access provisions of the Act, the court finds that Plaintiffs have not carried their burden of proof.

Plaintiffs are entitled to judgment on Counts I and II based on two types of violations of the Medicaid Act: (1) inadequate or non-existent medical assessments and coordination of needed services for children with serious emotional disturbances, and (2) inadequate or non-existent in-home behavioral support services for the same group.

With regard to assessment and coordination of services, the testimony of virtually all of Plaintiffs'—and for that matter Defendants'—witnesses established that compliance with Medicaid's EPSDT mandate for children with a serious emotional disturbance requires that Defendants provide, at a minimum, reasonably comprehensive medical assessments and ongoing clinical oversight of the services being provided. The evidence established overwhelmingly that, for this particularly needy group, assessment and coordination is essential to (a) identify promptly a child suffering from a serious emotional disturbance, (b) assess comprehensively the nature of the child's disability, (c) develop an overarching treatment plan for the child, and (d) oversee implementation of this plan (typically by multiple medical providers) as the needs of the child evolve.

The evidence showed, time and again, that the Commonwealth's efforts to comply with these minimum EPSDT assessment and service coordination requirements were woefully inadequate, with detrimental consequences for thousands of vulnerable children. At present, thousands of needy SED children lack comprehensive assessments; treatment occurs haphazardly, with no single person or entity providing oversight and ensuring consistency. Multiple providers offer overlapping and sometimes conflicting services, with little or no knowledgeable, overall coordination.

The second aspect of Defendants' Medicaid violation concerns the provision of in-home behavioral support services. Plaintiffs offered credible evidence that such services are a medical necessity for many SED children, particularly the roughly 15,-000 Medicaid-eligible SED children in the Commonwealth who suffer extreme functional impairment. Except in rare instances, however, Defendants fail to provide these services adequately. The result of this failure is that thousands of Massachusetts children with serious emotional disabilities are forced to endure unnecessary confinement in residential facilities, or to remain in costly institutions far longer than their medical conditions require. The shortage or inadequacy of in-home support services often results in removal of a fragile child from his or her home. While such a removal is a heartbreaking consequence in and of itself, it is equally clear that the unnecessary isolation of a child in an ex-

pensive residential facility has well-documented, objective clinical sequelae. These are reflected in exacerbated symptoms including: failure at school, inability to relate positively to others, isolating depression, and assaultive or other anti-social behavior.

The undisputed evidence offered at trial made it clear that children with serious emotional disabilities are among the most fragile members of our society; their medical needs frequently extend across a spectrum of service providers and state agencies. Prompt, coordinated services that support a child's continuation in the home can allow even the most disabled child a reasonable chance at a happy, fulfilling life. Without such services a child may face a stunted existence, eked out in the shadows and devoid of almost everything that gives meaning to the gift of life. Defendants' failure to provide adequate assessments, service coordination, and home-based supportive services for Medicaid-eligible children with serious emotional disturbances was glaring from the evidence and at times shocking in its consequences.

## II. *THE STATUTORY ENVIRONMENT*

### A. *The Medicaid Act and Regulations.*

In passing the Medicaid Act, Congress embarked on an ambitious program to provide medical care for the country's poorest people. The Act creates a "cooperative federal-state program" through which states that elect to participate receive federal financial assistance to pay for the medical treatment of specific groups of needy individuals. *See Pharm. Research & Mfrs. of Am. v. Walsh,* 538 U.S. 644, 650, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003); *Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). To receive the funds, states are required first to formulate a plan that meets federal requirements. *See Frew ex*

*rel. Frew v. Hawkins,* 540 U.S. 431, 433, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004); *Ark. Med. Soc'y, Inc. v. Reynolds,* 6 F.3d 519, 522 (8th Cir.1993) (noting that a state's plan must comply with the "fifty-eight subsections outlined in 42 U.S.C. § 1396a").

A state's plan must provide coverage to seven designated classes of needy individuals, termed "categorically needy," for at least seven specific kinds of medical care or services. *See* §§ 1396a(a)(10)(A)(i), -(a)(17), 1396d(a). *See Pharm. Research & Mfrs.,* 538 U.S. at 651 n. 4, 123 S.Ct. 1855. A state may, if it chooses, extend this coverage to other designated populations, termed "medically needy." § 1396a(a)(10)(C). Additionally, the state may choose to expand the care and services available under its plan beyond the seven mandated categories. *See* §§ 1396a(10)(A), 1396d(a) (defining "medical assistance" by enumerating twenty-eight types of care and services). For example, a state must provide coverage of inpatient hospital and physicians' services, but retains the option of covering private duty nursing or physical therapy services. *See* §§ 1396a(a)(10)(A), 1396d(a).

Congress does not require states to participate in the Medicaid Act. However, once a state opts in, it must abide by Medicaid's laws and regulations in order to obtain federal funds. *See Bowen v. Massachusetts,* 487 U.S. 879, 883, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *Bryson v. Shumway,* 308 F.3d 79, 81 (1st Cir.2002); *see also* 42 U.S.C. § 1396a. Although the Medicaid statute and its regulations impose many obligations, states do retain substantial discretion in implementing their plans and in choosing "the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in the best interests of the recipients." *Alexander v. Choate,*

469 U.S. 287, 303, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), *quoted in Pharm. Research & Mfrs.*, 538 U.S. at 665, 123 S.Ct. 1855; *see also* 42 C.F.R. § 440.230(d) (2005) (allowing states to "place appropriate limits on service based on such criteria as medical necessity or on utilization control procedures"); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 591 (5th Cir.2004); *Ark. Med. Soc'y*, 6 F.3d at 531 (holding, in a case involving the equal access provision, that a state "may take ... budget factors into consideration when setting its reimbursement methodology," but "may not ignore the Medicaid Act's requirements in order to suit budgetary needs"); *J.K. ex rel. R.K. v. Dillenberg*, 836 F.Supp. 694, 697 (D.Ariz.1993).

Plaintiffs challenge Defendants' compliance with three Medicaid Act provisions: EPSDT, reasonable promptness, and equal access. Each has its own particular requirements.

### 1. *EPSDT.*

As broad as the overall Medicaid umbrella is generally, the initiatives aimed at children are far more expansive. When Congress amended the Medicaid statute in 1989, it made the provision of "early and periodic screening, diagnostic, and treatment services" ("EPSDT" services) to Medicaid-eligible children mandatory for participating states. Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, § 6403, 103 Stat. 2261–2265, 2268, 2269 (codified as amended at 42 U.S.C. § 1396d(r)(2005)); 42 U.S.C. § 1396d(a)(4)(B), -(r). In defining EPSDT services, Congress required states to include four types of specific services: screening, vision, dental, and hearing services. In addition to these services, the statute mandated the provision of

> [s]uch other necessary health care, diagnostic services, treatment, and *other measures described in subsection (a)* of this section to correct or ameliorate de-

fects and physical and mental illnesses and conditions discovered by the screening services, *whether or not such services are covered under the state plan.*

42 U.S.C. § 1396d(r)(5)(emphasis added).

■ Subsection (a), which defines the term "medical assistance," enumerates seven categories of care and services that must be covered under a state's plan. In addition, twenty-one other categories may, at the option of the state, be included under the state's Medicaid plan. *See* § 1396d(a). Therefore *all* twenty-eight types of medical care and services contained within the definition of "medical assistance" are mandated EPSDT services. Thus, Congress

> imposed a mandatory duty upon participating states to provide EPSDT-eligible children with *all the health care, services, treatments and other measures described in § 1396d(a) of the Act,* when necessary to correct or ameliorate health problems discovered by screening, *regardless of whether the applicable state plan covers such services.*

*S.D.*, 391 F.3d at 589–90(emphasis added); *see also Rosie D.*, 310 F.3d at 232 (stating that the 1989 amendments "required states to provide Medicaid coverage for any service 'identified as medically necessary through the EPSDT program'") (quoting 135 Cong. Rec. S6899, 6900 (daily ed. June 19, 1989)(statement of Sen. Chafee)).

■ In other words, while a state may choose which medical services beyond the mandated seven it may offer to eligible adults, states are bound, when it is medically necessary, to make available to Medicaid-eligible children *all* of the twenty-eight types of care and services included as part of the definition of medical assistance in the Act. *See S.D.*, 391 F.3d at 590 ("[E]very Circuit which has examined the scope of the EPSDT program has recognized that states must cover every type of health care or service necessary for

EPSDT corrective or ameliorative purposes that is allowable under 1396d(a)."); *Collins v. Hamilton*, 349 F.3d 371, 376 n. 8 (7th Cir.2003) ("[O]ther circuits [have] also found that in the context of individuals under the age of twenty-one subject to EPSDT services, a state's discretion to exclude services deemed 'medically necessary' by an EPSDT provider has been circumscribed by the express mandate of the statute.")

■ Because the only limit placed on the provision of EPSDT services is the requirement that they be "medically necessary," the scope of the EPSDT program is broad. *See, e.g., S.D.*, 391 F.3d at 594–95 (finding disposable incontinence underwear qualifies under "home health care services", § 1396d(a)(7), as a form of medical assistance for which the state must cover the costs); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 293 F.3d 472, 480 (8th Cir.2002) (holding that Medicaid-eligible children have "a federal right to early intervention day treatment when a physician recommends such treatment"); *Pittman ex rel. Pope v. Sec'y, Fla. Dep't of Health & Rehab. Servs.*, 998 F.2d 887, 892 (11th Cir.1993) (holding that the discretion Medicaid gives states to elect not to cover organ transplants for adults does not extend to cases involving qualified Medicaid recipients under age twenty-one); *Chisholm v. Hood*, 133 F.Supp.2d 894 (E.D.La. 2001) (holding that the state must provide services rendered by a licensed psychologist because services by psychiatrists or other practitioners cannot substitute).

■ The breadth of EPSDT requirements is underscored by the statute's definition of "medical services." Section 1396d(a)(13) defines as covered medical services any "diagnostic, screening, preventative, and rehabilitative services, including any medical or remedial services ... for the *maximum reduction of physical or mental disability* and restoration of an individual to the *best possible functional level.*" 42 U.S.C. § 1396d(a)(13) (emphasis added). Thus, if a licensed clinician finds a particular service to be medically necessary to help a child improve his or her functional level, this service must be paid for by a state's Medicaid plan pursuant to the EPSDT mandate. *See* §§ 1396d(a)(13), 1396d(r)(5); *Pediatric Specialty Care*, 293 F.3d 472.

Courts construing EPSDT requirements have ruled that so long as a competent medical provider finds specific care to be "medically necessary" to improve or ameliorate a child's condition, the 1989 amendments to the Medicaid statute require a participating state to cover it. *See, e.g., Collins*, 349 F.3d at 375 (holding that if a competent medical service provider determines that a specific type of care or service is medically necessary, state may not substitute a different service that it deems equivalent); *see also Rosie D.*, 310 F.3d at 232; *John B. v. Menke*, 176 F.Supp.2d 786, 800 (M.D.Tenn.2001) (noting that a state "is bound by federal law to provide 'medically necessary' EPSDT services").

Congress' firm intent to ensure that Medicaid-eligible children actually receive services is powerfully underlined by provisions in the statute that place explicit duties on states to: (a) inform eligible children of the availability of early and periodic screening, diagnostic, and treatment services, (b) provide or arrange for screening services "in all cases where they are requested," and (c) arrange for whatever corrective treatments are discovered to be needed. *See* § 1396a(a)(43); *see also* 42 C.F.R. § 441.56(a)(1), -.61, -.62 (2005).

■ The requirement that states inform eligible children of EPSDT services has both procedural and substantive implications. States must draft guidelines by which the information regarding EPSDT services is to be transmitted; they must also ensure that effective notice, in fact,

reaches children and their families. *See* 42 C.F.R. § 441.56(a)(1) (2005). If a state's scheme for informing children of their rights is ineffective or conveys out-of-date or inaccurate information, the state is not in compliance with the law. *See Health Care for All v. Romney*, Civ. No. 00–10833RWZ, 2005 WL 1660677, at *14 (D.Mass. July 7, 2005) (Zobel, J.) (concluding that the state violated its duty to inform children of EPSDT services where notices sent to children and their families contained "incorrect or outdated guidance on obtaining services"); *cf. Pediatric Specialty Care*, 293 F.3d at 481 ("The state may not shirk its responsibilities [under § 1396a(a)(43) ] to Medicaid recipients by burying information about available services in a complex bureaucratic scheme."); *John B.*, 176 F.Supp.2d at 802 ("The State must assure that the contractors provide adequate outreach efforts"); *Chisholm*, 133 F.Supp.2d at 901 (concluding that the state's system for providing access to psychological services for Medicaid-eligible children rarely resulted in children successfully receiving the services and fell "woefully short of complying with federal law").

■ Moreover, in *Health Care for All*, the court noted that the Act requires a proactive approach. The statute effectively requires states to identify obstacles to the effective conveyance of information and to "develop measures to mitigate the negative impact of such potential influences." 2005 WL 1660677 at *14.

### 2. *Reasonable Promptness.*

The statute also requires states to provide medical attention in a timely manner. Assistance must be "furnished with reasonable promptness to all eligible individuals." § 1396a(a)(8); *see also Doe ex rel. Doe v. Chiles*, 136 F.3d 709, 718 (11th Cir.1998) (finding that because "[t]he language of the statute is undoubtedly cast in mandatory rather than precatory terms," the reasonable promptness clause imposes a binding obligation).

The accompanying Medicaid regulations require state agencies to "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures." 42 C.F.R. § 435.930 (2005). In addition, the state agency "must set standards for the timely provision of EPSDT services which meet reasonable standards of medical ... practice, ... and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services." *Id.* § 441.56(e).

Although the statute does not specifically define "reasonable promptness," courts facing this question have found defendants in violation of the provision when eligible individuals are placed on waiting lists for medically necessary services. *See, e.g., Sobky v. Smoley*, 855 F.Supp. 1123, 1148 (E.D.Cal.1994) (discussing the history of the "reasonable promptness" language and noting that it is intended to prevent states from "establish[ing] waiting lists for individuals eligible for assistance" (quotation omitted)). Courts have also found a failure to comply with the statute where a state fails to establish guidelines for the timely provision of services recommended after a screening. *See Kirk T. v. Houstoun*, Civ. No. 99–3253, 2000 WL 830731, at *4, 2000 U.S. Dist. LEXIS 8768, at * 14 (E.D. Pa. June 23, 2000) (finding the defendant in violation of the "reasonable promptness" provision where the state lacked "some method of measuring timeliness," thus making it "impossible to tell whether the state is in compliance with the Medicaid statute").

■ A reasonable promptness violation may also turn on the nature of the services provided. In *Boulet v. Cellucci*, plaintiffs received access to some services in a

prompt manner, but were denied access to the specific services they had requested. The court held that "the assistance must correspond to the individual's needs" and that the requirement of prompt provision of services "is not satisfied by other services the plaintiffs are receiving or might be offered." *Boulet v. Cellucci*, 107 F.Supp.2d 61, 79 (D.Mass.2000) (Woodlock, J.).

### 3. *Equal Access.*

Finally, states must satisfy the "equal access" provision of the Medicaid statute. *See Ark. Med. Soc'y*, 6 F.3d at 522. Section 1396a(a)(30)(A) requires states to:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers *so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.*

42 U.S.C. § 1396a(a)(30)(A)(emphasis added); *see also* 42 C.F.R. § 447.204 (2005).

 The purpose of the equal access provision and its corresponding regulations is "to prevent gross disparity between the availability of [a] service to Medicaid patients and its availability to those who can afford to pay privately." *King v. Sullivan*, 776 F.Supp. 645, 655 (D.R.I.1991) (stating that "[t]he 'sufficiency' of a state's reimbursement payments is measured against the payments that a health care facility can demand from non-Medicaid patients").

### B. *EPSDT Caselaw.*

Since the enactment of the EPSDT provisions of Medicaid in 1989, courts have regularly been called on to judge whether a state is meeting its obligations to Medicaid-eligible children and have frequently found states in violation of the law. *See Health Care for All*, 2005 WL 1660677 (finding for plaintiff in an EPSDT suit against Massachusetts based on lack of access to Medicaid-covered dental services); *see generally Collins*, 349 F.3d 371; *Pediatric Specialty Care*, 293 F.3d 472; *John B.*, 176 F.Supp.2d 786 (involving enforcement of a consent decree, but basing decision on defendants' failure to comply with federal law); *Chisholm*, 133 F.Supp.2d 894 (E.D.La.2001); *Salazar v. District of Columbia*, 954 F.Supp. 278 (D.D.C.1996).

Three of these cases are particularly helpful in illustrating how courts have enforced the EPSDT provisions of the Medicaid Act; they involve treatments and services for children who, like the class of plaintiffs here, suffer from chronic behavioral and psychiatric conditions. *Collins* found that the state of Indiana was required to provide long-term treatment in psychiatric residential treatment facilities to children with mental illness. *Pediatric Specialty Care* held that Medicaid's EPSDT provisions require the state of Arkansas to provide early intervention day treatment when a physician recommends such treatment. *Chisholm* concluded that federal law obliges the state of Louisiana to offer autistic children behavioral and psychological services, rendered by licensed psychologists.

 A common analytical approach emerges from these three decisions. First, each court analyzes whether the services or treatments sought by the plaintiffs are covered under the Medicaid Act. Second, the court examines whether the state in fact provides the sought-after services. There are several elements to this second

inquiry. For example, if a competent and credible diagnosis shows that a child requires a specific treatment, courts will find that the state has an obligation to provide it; a state's attempts at substitutes will be viewed with skepticism, especially where their availability or adequacy is doubtful. Additionally, even if the state offers the service or treatment on paper, courts will examine whether children can, in practice, actually access these services. Where a state has failed to provide treatments and services covered by Medicaid, a court will proceed to consider an appropriate remedy, giving the state the opportunity initially to fashion its own remedial proposal.

In this case, the court's conclusion that Defendants have failed to provide mandated EPSDT services to the plaintiff class rests on this analytical platform. Indeed, the first inquiry is easily disposed of, since Defendants do not substantially contest the claim that service coordination and in-home support services for the plaintiff class are covered by Medicaid.[2] The heart of the dispute in this case is whether the relevant services are actually being provided. On this point, as the following findings will demonstrate, Plaintiffs have proved by more than a preponderance of the evidence that thousands of seriously emotionally disturbed children in the Commonwealth are simply not receiving the EPSDT services they are entitled to under federal law.

## III. FINDINGS OF FACT

### A. Preliminary Issues.

Before weighing the quantum of proof, it is important to note four points.

First, the comprehensiveness of Plaintiff's evidence is prodigious. Plaintiffs offered evidence in seven different categories: (a) testimony of parents or custodial relatives of several of the named plaintiffs; (b) testimony of clinicians who have served or are serving specific class members; (c) testimony of agency personnel who provide, or attempt to provide, services to seriously emotionally disturbed children within the Commonwealth generally; (d) reports and testimony of expert clinicians who studied the Commonwealth's overall system for delivering services to these children; (e) analysis of the services received by a sample of thirty-five randomly selected seriously emotionally disturbed children who are class members but not named plaintiffs; (f) documents containing data submitted to the Massachusetts legislature by Defendants on the actual utilization of existing services; and (g) testimony from directors of programs that currently are providing, for a very limited number of class members, medical services that, in fact, fully comply with Medicaid requirements. Finally, a hastily enacted and ineffective state Benefit Clarification, apparently intended to convey the impression that Defendants are complying with Medicaid requirements, served only to highlight the deficiencies in Defendants' service delivery system.

Defendants' counsel's determined efforts to prick holes in this imposing corpus of evidence failed to reduce, to any significant degree, its credibility and powerful impact. Logistical, financial, and ethical restrictions, for example, reduced Plaintiffs' ability to extract and analyze a sample of class

---

**2.** Defendants do vigorously dispute Plaintiffs' argument that they are entitled to "intensive home-based services," a phrase that Defendants contend describes only one of several possible *methods* of service delivery and not an actual treatment. With equal vigor, however, Defendants assert that Massachusetts already does provide the specific array of substantive clinical interventions, including service coordination and in-home supports, that they admit Medicaid statute's EPSDT provisions require. The strong weight of the evidence offered at trial emphatically rebuts the latter assertion.

members that was identified in accordance with the strictest academic requirements for perfect randomness. Nevertheless, the thirty-five children analyzed were chosen in a reasonably fair manner designed to minimize bias. The credible evidence demonstrated that the vast majority of this group needed, but was not receiving, clinical interventions such as comprehensive assessments, service coordination, crisis intervention, and in-home supports that Defendants concede are required under the Medicaid statute. This evidence, though only one portion of Plaintiffs' case, was vividly probative.

Short of bringing to court a parent or guardian of every one of the thousands of class members, and offering testimony by an expert clinician for each child, it is hard to imagine how a more meticulously constructed case could have been offered on behalf of the plaintiff class. Moreover, Defendants' failure or inability to offer their own opposing concrete evidence showing actual delivery of services to the class members speaks volumes.[3] Defendants' witnesses did provide fairly detailed evidence of the general *design* of the system intended to provide children in the Commonwealth with EPSDT services, along with descriptions of the way the system was *supposed* to work. Defendants, however, offered little objective data on the actual amount or quality of service delivered to class members or its clinical impact. The available data tended to show that EPSDT services—outside a few, limited geographic areas—were simply not being provided effectively to children with serious emotional disturbances in the Commonwealth.

Second, before embarking on a recital of the court's findings of fact, it is important to trace the temporal boundaries of the evidence. Before trial, Plaintiffs sought a ruling barring Defendants from offering any evidence regarding activities or services after September 30, 2004, the date discovery closed. In response, Defendants argued that the court should have a full and accurate picture of the efforts made by the state to comply with the Medicaid statute even after that date. The court concluded that, in determining liability, it would generally consider only evidence pre-dating September 30, 2004, with exceptions for good cause, but might consider evidence of later conduct if liability were found and it became necessary to consider an appropriate remedy. Therefore, the findings of fact set forth in this memorandum with respect to liability are based mainly on information current as of September 30, 2004.[4]

Third, in rendering its findings of fact the court has chosen, for the most part, to discard the label "intensive home-based services" used by Plaintiffs as a short-hand for the amalgam of clinical interventions they claim the EPSDT portions of the Medicaid statute require Defendants to provide. The term generated an unhelpful, time-consuming, and largely irrelevant dispute over whether the phrase describes a discrete clinical intervention (i.e., an actual form of treatment) or merely one method or system for delivering medical treatment. Rather than enter into this semantic debate, the court has looked behind the phrase to the array of actual clinical interventions that constitute, in the terms of the Medicaid statute, "medically necessary" services for class members.

---

3. This observation should not be interpreted as a criticism of Defendants' counsel. The quality of advocacy on both sides was outstanding.

4. The cut-off was obviously necessary. Permitting Defendants to offer evidence acquired after the close of discovery would leave Plaintiffs unprepared to challenge the newly-acquired material.

Viewed from this perspective, the evidentiary landscape is greatly simplified. Plaintiffs' reasonable medical needs are not dramatically different from the needs of anyone else with a significant medical problem. Children with serious emotional disturbances must be made aware of the availability of services and their entitlement to them; they need comprehensive assessments of the nature of their disabilities; each child also requires the development of a clinical plan to address the disability, and he or she needs a properly-trained and empowered person to monitor implementation and (when necessary) modification of the plan to ensure that its benefits are actually realized. This is not, in the well-worn phrase, rocket science; diagnosing maladies, prescribing treatments, and monitoring outcomes is at the heart of what clinicians do. Yet on the whole these medical services are not being provided, or are being provided inadequately, to the thousands of vulnerable children with serious medical needs who comprise the plaintiff class.

While children with serious emotional disturbances are, in most respects, no different from other persons with medical problems, certain unique features of their clinical environment make scrupulous attention to their medical needs especially critical. First, the complexity of their problems may require a range of services from different providers (for example, medication monitoring, behavioral supports, and crisis intervention) in different arenas (for example, home, school, or community). As a result, centralized, knowledgeable, and painstaking service coordination is essential; without it, a child's life becomes a chaos of ineffective, overlapping plans and goals. Second, SED children suffer both a high risk of clinically unwarranted institutionalization and a possibility that, once institutionalized, they will encounter delays returning to the community. As delays lengthen, the likelihood of

successful re-integration into a home or home-like setting diminishes. A lonely, stunted existence becomes a distinct possibility. For this reason, the provision of competent, in-home supports, including prompt crisis intervention to contain episodes when a child's needs may be particularly intense, is widely recognized as clinically appropriate and, indeed, essential for children with serious emotional disturbances.

In shifting the focus away from the phrase "intensive home-based services," and towards the medical services behind these words, the court has not altered in any way the nature either of the lawsuit or of the remedy Plaintiffs seek. Plaintiffs have consistently argued that Defendants have failed to provide the actual services falling under the rubric of "intensive home-based services"—e.g., comprehensive assessment, effective service coordination, and adequate in-home behavioral supports. Defendants have consistently contended that these actual services *are* being provided, though in a manner different from what Plaintiffs would prefer.

As the court's summary below will demonstrate, the evidence belies Defendants' contention; in fact, the actual clinical interventions described by Plaintiffs with the phrase "intensive home-based services" are *not* being provided adequately.

Fourth, and finally, it is important to note that in making these findings the court has not attempted to comment on every piece of evidence offered. Much evidence that supports the court's findings has not been recited; similarly, not every stray piece of evidence that may run contrary to the court's findings has been addressed. Despite the abbreviation necessary to keep this memorandum to a reasonable length the court has considered *all* the evidence. This is not a close

case; the evidence favoring Plaintiffs is overwhelming.

## B. *Plaintiff Class: Medically Necessary Treatment Generally.*

1. Children with serious emotional disturbances,[5] have been diagnosed with a mental illness (e.g., bipolar disorder or autism) and suffer a significant functional impairment in multiple settings (e.g., home and/or school) for a period lasting at least one year. Their strictly medical problems are often exacerbated by external traumas arising from poverty, family chaos or violence, drug abuse, separation from loved ones, and institutionalization.

2. Children with SED are particularly challenging to treat because of the severity of their needs and the number and intensity of services they require. The danger for these children, given their complex problems, is that they will not only receive insufficient services, but that a lack of coordination among the service providers will undermine the effectiveness of the treatment that they do receive. Comprehensive assessments and scrupulous service coordination are essential parts of the Commonwealth's EPSDT responsibility to children with SED. Defendants' provision of these services has been markedly lacking.

3. Children with SED suffer a chronic disability and therefore tend to require long-term care and support. With limited exceptions, Defendants' system generally addresses children's serious emotional disturbances only in crises, offering few options (other than residential programs) for effective, ongoing care after acute episodes and minimal resources for coordination of treatment over the extended period that SED children usually require. Long-term, in-home support services that address the chronic medical needs of SED children, including crisis intervention services that avoid or reduce the necessity of residential treatment out of the home, are part of the package of medically necessary EPSDT services Defendants are required to provide. Except in limited circumstances, Defendants have failed to meet this requirement.

## C. *Overview of Massachusetts' Medicaid Program.*

4. Massachusetts has chosen to participate in the Medicaid program and, pursuant to 42 U.S.C. § 1396a(a)(5), has designated the Executive Office of Health and Human Services ("EOHHS") as the single state agency responsible for administering the Medicaid program in Massachusetts. The division within EOHHS that administers Medicaid is called the Office of Medicaid, also known as "MassHealth."

5. When a child first enrolls in the Massachusetts Medicaid plan, his or her guardian selects one health plan from the five offered by the state to Medicaid-eligible individuals. Four of the plans are managed care organizations [6] covering limited geographical areas; the last plan, called the Primary Care Clinician ("PCC") plan, is state-managed and is available state-wide. The five plans offer a common set of health care services.

6. The Massachusetts Behavioral Health Partnership (MBHP), a private entity contracting with the Commonwealth, provides all behavioral and mental health services for Medicaid-eligible individuals who elect to enroll in the PCC plan.

---

5. The condition SED, as abbreviated, is recognized in the Individuals with Disabilities Education Act, 20 U.S.C. § 1401(3)(A)(i)(2005), and in its regulations, 34 C.F.R. § 300.7(a)(1),—(c)(4)(2005).

6. The four managed care organizations are the Neighborhood Health Plan, Network Health, Boston Medical Center Health Plan, and the Fallon Community Health Plan.

7. The families of half of all Medicaid-recipient children choose the state-wide PCC plan and therefore receive behavioral and mental health services through MBHP. Approximately 59,000 children under the age of eighteen [7] in Massachusetts suffer from a serious emotional disturbance with extreme dysfunction, the most severely handicapped sup-group of SED children. Many additional SED children suffer some lesser degree of impairment. Approximately twenty to twenty-five percent of all Massachusetts children are Medicaid eligible. Accordingly, employing a very conservative estimate, there are between 14,000 and 15,000 Medicaid-eligible children in Massachusetts with SED and extreme functional impairment.

8. Because MBHP is the largest contractor of behavioral health services for the MassHealth program, the parties focused on MBHP's provision of mental and behavioral health services to illustrate generally how these services are provided to all Medicaid-eligible children in Massachusetts. The mental and behavioral services offered through MBHP are essentially the same as those available through the other four health plans. The case was tried on the implicit assumption that if the provision of services for SED children through MBHP fell short of the requirements of the Medicaid statute, then Plaintiffs were entitled to a verdict in their favor.

9. The PCC Behavioral Health Program contract between the state's Division of Medical Assistance and MBHP is a roughly 500–page document detailing MBHP's duties and responsibilities, including covered services, network management, and quality management. (Defs.' Ex. [hereinafter "DX"] 35.)

10. The Commonwealth contracts with MBHP, and MBHP, in turn, either provides behavioral and mental health services directly or indirectly by subcontracting with other private service providers.

11. Despite considerable effort, programs offered through MBHP frequently fail to provide Medicaid-eligible SED children with the comprehensive, reasonably well-coordinated treatment that their medical needs require. Instead, with limited exceptions, the families of SED children are confronted by a patchwork of services, many with arbitrary time limits that are difficult to extend, and with a dearth of long-term in-home supports. Defendants' contention that, prior to September 30, 2004, services for SED children were available as long as medically necessary, is not credible and was repeatedly rebutted by the evidence.

## D. *Medicaid Program Components.*

### 1. *Notification of EPSDT Services.*

12. As noted earlier, because it receives Medicaid funds, the Commonwealth is responsible for informing Medicaid-eligible children of their EPSDT rights, as well as for arranging services once a need has been identified. The Commonwealth performs this responsibility in two ways, directly and through third-party providers.

13. When a child first enrolls in the Massachusetts Medicaid plan, his or her guardian receives the "MassHealth Enrollment Guide." (DX 13.) The guide lists among covered services "Mental Health Care," including hospital care, family stabilization teams, and other outpatient services. EPSDT services are not explicitly mentioned.

---

7. The Medicaid Act defines children as under the age of twenty-one. Hence, the total number of children in Massachusetts under twenty-one with SED with substantial functional impairment must be greater than the state's estimate of "children," since the state only counts children under eighteen in its estimates.

14. Medicaid-eligible families who enroll in the PCC plan also receive a 24–page plan booklet. This booklet informs PCC members that they do not need a referral to receive mental health services but that their child's therapist must be a part of the MBHP network. Examples of available mental health services, such as counseling, day treatment, and community support services, are noted. PCC enrollees are also informed of their right to appeal MBHP decisions denying coverage for services that their child's provider requested. Again, this material makes no mention of EPSDT services.

15. MassHealth periodically mails postcards, brochures, and other notices informing eligible members of their rights to EPSDT services. These notices list services such as check-ups, dental exams, and immunizations but do not mention any mental health services.

16. All MBHP members receive a brochure entitled, "Does Your Child Need Mental Health or Substance Abuse Services?" (DX.62). This brochure describes situations or symptoms that parents might encounter that demonstrate a possible need for mental or behavioral health services. The brochure also lists types of available services, specifically including Family Stabilization Team (FST) and Emergency Service Provider (ESP) services.

17. In addition to the mailings and brochures sent directly to Medicaid-eligible children and their guardians, the Commonwealth relies on the children's primary care clinicians to provide information about EPSDT benefits and services. The contract between MassHealth and the primary care clinicians enumerates the clinicians' responsibilities with respect to meeting EPSDT requirements.

### 2. *Comprehensive Assessments.*

18. Under the PCC plan, the initial responsibility for performing assessments of the mental health needs of a MassHealth-eligible child falls on the child's pediatrician. Though this clinician may not have specialized training in mental health, he or she is expected to perform a developmental and behavioral assessment of each child who comes in for a periodic appointment or an acute problem, such as emergency treatment. MBHP also offers special assessments at particular times (e.g., when medication is being considered or when the Department of Social Services assumes custody of a child).

19. The evidence shows that this approach to assessing children with serious emotional disturbances is deficient in a number of respects. First, no feature of the Commonwealth's Medicaid system assures that SED children will necessarily receive these pediatric assessments at any particular time or in any consistent form. The evidence makes clear that thousands of SED children in Massachusetts get no comprehensive assessments at all. Second, no agency or individual is responsible for insuring that these initial assessments, if they occur, are passed on to the agencies who will ultimately be responsible for treating the child. As a result, it is uncertain that the pediatric assessment will be incorporated into any detailed plan to address an SED child's complex needs. Third, many if not most of the assessments that are performed lack depth and comprehensiveness. For example, an ad hoc "assessment" of a bipolar or autistic child performed in a hospital emergency room during a crisis will rarely be the sort of in-depth analysis that can serve as the foundation of the child's long-term treatment.

20. The evidence and argument offered by Defendants on the issue of assessments exemplifies a recurrent problem for the

court in weighing the evidence. Defendants concede, as they must, that compliance with the EPSDT provisions of the Medicaid statute requires comprehensive assessments of SED children. Without a clinically appropriate, detailed assessment of an SED child, proper treatment is obviously impossible. Because some SED children do receive assessments in a variety of contexts, Defendants argue that Plaintiffs cannot show, at least in this respect, that Defendants have failed to comply with the Medicaid statute. The problem with this reasoning is that it assumes that any "assessment" suffices to show compliance with the statute. A proper assessment must be comprehensive and in depth; it must be performed, at a minimum, by a trained professional, and more often by a team of professionals and knowledgeable lay persons, including family members. Finally, it must be made available to the agency actually providing treatment.

21. The evidence establishes that the MBHP contract titularly covers "assessments" for SED children but that these assessments are often cursory and ad hoc—assessments in name only. Moreover, very often these assessments are not passed along to appropriate service providers and incorporated into any properly coordinated treatment plan. In addition, as noted, a large number of SED children receive no assessments at all. Even acknowledging the many genuinely committed people within the Commonwealth's system of care, it is hard not to suspect an element of cynicism in this deficiency. The simplest way to escape the challenge of serving an SED child is to avoid conducting the sort of in-depth, comprehensive assessment that will reveal the real extent of that child's medical needs. Whether conscious or unconscious, this is the strategy being employed by the current system as regards many of the SED children in the Commonwealth at this time.

### 3. *Crisis Services.*

22. For most children suffering serious emotional disturbances with extreme dysfunction, acute episodes are inevitable. Any system intended to supply necessary medical treatment to SED children must foresee crises and address the proper clinical response to them ahead of time, as part of the child's treatment planning. Defendants do not provide this necessary medical service to the overwhelming majority of SED children in the Commonwealth.

23. Statewide, there are twenty-eight Emergency Service Providers (ESPs) contracted with MBHP to provide emergency screening and assessment when a child experiences a behavioral crisis. These ESP programs are designed to provide short-term counseling as well as behavior specialists to work with the child during a crisis. Generally, an ESP's assignment is to intervene, quell the immediate crisis, and move on.

24. In practice, SED children and their families often encounter difficulties getting access to crisis services. It is frequently difficult to transport a distraught or uncooperative child to an ESP location for specialized treatment. MBHP contractors sometimes provide mobile crisis services that can respond to emergencies in the child's home. Many times, however, because of other demands on staff or concerns regarding safety, crisis intervention is not offered in the child's home but, rather, at the agency's office or at a general hospital, where a child may have been brought by the police.

25. Emergency service staff attempt to reduce the need hospitalize the child but are often unsuccessful. MBHP funds Crisis Stabilization Units ("CSUs"), which provide short-term, hospital-level services in a community setting, such as a group home. These programs sometimes help to reintegrate a child with his or her family;

frequently, however, the CSU simply acts as a transition from home to a long-term residential placement.

26. A significant shortcoming of most of the crisis services is that they help the child and her family only through the immediate emergency situation. Once the episode is over, the crisis service terminates; the child is either left to the services she has been receiving or is referred to a different program for further treatment. Even a CSU, which sometimes offers brief follow-up interventions after a crisis, is modeled as a short-term service.

27. Moreover, as noted, crisis services offered by MBHP are almost never coordinated with any overall treatment plan. Coordination for SED children is essential to ensure that crisis intervention is consistent with the child's ongoing treatment. Planned and coordinated intervention for predictable crises is largely unavailable through MBHP's services.

### 4. In–Home Support Services.

28. As noted, children with SED require in-home supports of adequate intensity and duration to head off crises and forestall clinically unnecessary placements outside the home. The regular, long-term presence of a clinician or trained paraprofessional in the home on a regular basis—forming a relationship with the child, modifying problematic behaviors, taking the child on outings, offering support in school, relieving the parents or guardians during evenings or weekends—is a critical part of the treatment plan of many SED children.

29. Defendants insist that numerous MBHP programs provide these support services. As with assessments, however, this type of necessary service exists largely on paper and to a limited degree only. The in-home support offered by MBHP falls far short of what is required, pursuant to the terms of the Medicaid statute,

"for the maximum reduction of physical or mental disability and restoration of the individual to the best possible functional level." 42 U.S.C. § 1396d(a)(13).

30. According to Defendants, two programs—the Family Stabilization Team (FST) and the Community Support Program (CSP)—offer the in-home support service that Plaintiffs are seeking through this lawsuit. These protestations notwithstanding, the evidence at trial demonstrated that neither FST nor CSP, as presently constituted, offers children with SED the EPSDT services necessary to treat their disability and minimize placement outside the home. Moreover, the availability of these programs is so restricted that they reach only a minute fraction of the children who might benefit from them.

31. The FST and CSP programs are designed for short-term interventions during acute episodes. Defendants' contention that these programs were available, as of September 2004, for as long as medically necessary, was not borne out by the evidence. Neither program is designed to serve children with chronic conditions who require varying levels of service over long periods, often through their entire childhood and adolescence. In addition to this limitation, neither program is adequately coordinated with the other treatment children may be receiving.

32. There are twenty-six providers of FST services throughout the state. The FST program is described in provider manuals as a short-term service; family support through this program is authorized by MBHP only for *three-week* periods; extensions must be specifically justified and authorized. Billing for FST services must be submitted in fifteen-minute units. On average, those children who receive FST services get approximately ten hours per week of service for each week that

they participate in the program.[8] The FST program serves about 1200 children per year (less than one-tenth of the estimate of total children suffering SED with extreme dysfunction in the Commonwealth), each of whom receives services for an average of six to eight weeks. A small percentage of these 1200 children (4.6%) receive services for over one hundred days. Between 2001 and 2004, the intensity of FST services decreased from an average of sixty hours of service to forty hours of service for each child who received these services.

33. FST programs provide only short-term crisis intervention and in-home support. Due to their time limitations and lack of coordination with other programs, these programs do not begin to address the chronic clinical needs of children with SED. The evidence regarding actual children—named plaintiffs and class members randomly selected from the general population of SED children—dramatically highlights the shortcomings of existing system. Jennifer, Kristen, Raymond, and John were all scheduled to lose necessary behavioral support services. Emil's FST services were eliminated when he left his mother's home to spend the summer with his father and not resumed on his return. Anton, age twelve, lost necessary support services at age nine. Many other identified children found themselves trapped in the same pattern: short-term support services were terminated as soon as the most acute stage of a crisis passed, virtually ensuring that another such episode would soon follow.

34. CSPs are generally designed for adults, though they do sometimes provide services to children with SED after a hospitalization or when there is an immediate risk of hospitalization. CSPs provide outreach and support services through paraprofessionals (as opposed to licensed clinicians). The program provides behavioral specialists, i.e., one-on-one workers who meet with a child to help improve the child's life skills and reduce the risk of needless institutionalization. CSP is a short-term service, intended as a step down from the FST program.

35. A tiny fraction of the state's Medicaid-eligible SED children, approximately 350, receive CSP services annually. The average duration of participation in the program has decreased between 2001 and 2004 from one hundred thirty-three days per episode to fifty-five days per episode. Children receive on average ten hours of CSP services per week each week that they participate in the program; the intensity of services has been decreasing over time, from eighty-five hours per episode in 2001 to thirty-eight hours per episode in 2004.

36. CSP suffers the same limitations as the FST program: inadequate duration and lack of coordination with other services. In addition, this program is only available after a child's condition has passed an emergency threshold. CSP does not help a child with SED avoid the behavioral decline that places a child at risk of hospitalization or institutionalization. It does not attempt to address the chronic needs of a seriously disabled child over an extended period of time.

37. Other programs, including Crisis Stabilization Units, Partial Hospitalization Services, Community–Based Acute Treatment Units, Enhanced Residential Care, and Transitional Care Units—all cited by Defendants as programs providing in-

---

8. The utilization numbers for FST and CSP services came from the report of Plaintiffs' expert Dr. James Conroy, using data provided by MBHP itself. Though Defendants challenged the reliability of Dr. Conroy's data compilation, they did not offer any opposing analysis. The court is satisfied that Dr. Conroy's estimates are fundamentally reliable.

home supportive services—are each inadequate in providing ongoing, coordinated treatment for children with SED. None provides the consistent, long-term home support that is an essential element of any effective treatment program for the plaintiff class. Moreover, in general, these programs are only available to children who have already been removed from their homes or from foster care placement. None is designed to support the child in his or her home for as long as medically necessary.

### 5. Service Coordination.

38. Within the Commonwealth's Medicaid system, the service coordinator goes by many names: case manager, care manager, clinical case/care manager, intensive care/clinical/case manager. These variously named persons may offer service coordination at varying levels of intensity. Except for a very few children fortunate enough to qualify for three state programs in limited geographical areas, however, a child with SED in the Commonwealth does not receive adequate case management services. Such services, in most cases, will necessarily entail designation of a trained individual who (1) meets regularly with the child and his or her family, (2) coordinates necessary diagnostic efforts to ensure that the child's disability is understood, (3) oversees the formulation of a plan to address the child's needs, and (4) takes primary responsibility to ensure that the plan is carried out (by whatever state or private contract agencies may be involved) and appropriately modified as the child's needs evolve. The evidence detailing MBHP's approach to case management provides a vivid picture of the deficiencies that plague this critical service.

39. MBHP subcontractors sometimes provide case management service as a feature of time-limited programs such as CSUs or FST programs. During the interval that a child receives services from one of these programs, a para-professional may assist the child and the family with therapy visits and other appointments by, for example, assisting with transportation. A social worker might identify additional care providers to augment a child's treatment, or coordinate the different services a child already receives, such as special education plans and after-school therapy. These case management services are often very helpful while they are available. Indeed, some of the named Plaintiffs have benefitted from them and suffered greatly when they were cut off. But, to repeat, the availability of FST and CSU services, with the associated case management and in-home support, is time-limited and tends to stop as soon as the child is perceived as having moved beyond a pressing crisis. These programs are generally not available to keep a child from going into an acute phase.

40. Apart from case management services delivered through subcontractors, MBHP directly provides three levels of case management for a limited number of eligible children. Significantly, for a child to qualify for this service, he or she must meet one of nine clinical criteria, including two admissions into twenty-four-hour care within one twelve-month period, a history of trauma, multiple state agency involvement, or a new diagnosis for a major mental illness in a child between the ages of three and eight. Children who do not meet at least one of these threshold criteria usually do not receive case management services through MBHP.

41. The three levels of case management service offered by MBHP to this defined group of SED children, from lowest to highest intensity, are (1) targeted outreach, (2) care coordination, and (3) intensive clinical management. Although touted by Defendants as "case management" neither "targeted outreach" nor

"care coordination" offers the kind of consistent, long-term oversight by a trained clinician or clinical administrator required by children with SED. Staff providing "targeted outreach" or "care coordination" do not convene treatment teams, do not supervise or even participate in the preparation of treatment plans, and do not provide oversight of clinical services on any long-term basis. Significantly, they almost never even meet the child, the family or the relevant service providers. Care coordinators mainly work by telephone, for example, assisting with the implementation of hospital discharge plans. Targeted outreach, MBHP's least intensive form of care coordination, provides ad hoc assistance with, for example, transportation to a medical appointment, locating housing, or making applications for disability benefits.

42. Intensive clinical management ("ICM"), which most closely resembles the service required by the plaintiff class, does actually coordinate the delivery of services to children with SED. ICM operates through a multi-disciplinary team and is not time-limited. Unfortunately, again, MBHP's intensive clinical managers rarely meet the children whose care they help coordinate; they carry an average case load of forty-five to fifty individuals. Moreover, the MBHP eligibility criteria for receiving the services of an intensive clinical manager do not allow access to this service for more than a small fraction of the children in the plaintiff class. Children are discharged from this program when they experience no more than one acute episode lasting no longer than three days during a ninety-day period.

43. It is impossible to overstate the importance of active, informed case management or, as it is sometimes called, service coordination for children with SED. Documents submitted in July 2003 by the Commonwealth to the federal government

noted that children with SED, their families, and the professionals serving them often find it difficult to identify the necessary programs among the "maze" of potentially available services and to navigate the Commonwealth's complex mental health delivery system.[9] The Commonwealth recognizes the need for knowledgeable case managers to steer disabled children through this labyrinth but has failed, in the overwhelming majority of instances, to give this essential assistance to children with SED. Care management is not even billed by MBHP as a clinical service, but rather as part of its administrative function, mainly focused on determining when services proposed by treating clinicians should be approved or disapproved. The testimony of guardians, clinicians, and program administrators confirmed again and again the devastating consequences of this service deficiency.

### E. *Programs Meeting EPSDT Requirements.*

44. One of the painful ironies that emerged from the evidence at trial is that adequate provision of necessary medical services for children with SED is not beyond the Commonwealth's expertise; nor is it any more costly than the current, inadequate programming. Defendants already fund three programs in Massachusetts that provide class members with a range of clinical interventions that, Plaintiffs readily concede, fully complies with all Medicaid requirements. The evidence demonstrates that these programs are no more expensive than the patched-together "treatment as usual" offered through the bulk of Defendants' Medicaid programming; objective evaluations confirm that the provision of treatment through these three existing programs is markedly better.

---

9. PX 0493, "Building and Financing Sustain-able Systems of Care."

45. The three programs successfully serving Medicaid-eligible children with SED are: Mental Health Services Program for Youth (MHSPY), Worcester Communities of Care (WWC), and Coordinated Family–Focused Care program (CFFC). These programs provide the comprehensive assessments, service coordination, crisis intervention, and in-home support services that children with SED require. Unfortunately, as of September 2004, these services are reaching only a minuscule portion of the plaintiff class.

46. MHSPY, WCC, and CFFC are similar to what are sometimes referred to a "wrap-around" programs; they provide a full range of services under one administrative and clinical umbrella. Defendants consider programs of this kind to be experimental, delivering services through a organizational structure they term a "system of care." Since programs like MHSPY and CFFC represent merely *ways* of delivering treatment and not, in themselves, *types* of treatment, Defendants argue, the Medicaid Act does not require the Commonwealth to provide access to these programs to all Medicaid-eligible children with SED. The evidence flatly contradicts this argument. The difference between, for example, MHSPY's delivery of clinical services, and the scattershot, uncoordinated treatment approach of the Commonwealth's "treatment as usual" for SED children is not a matter of mere form. The distinction was rather between effective and ineffective treatment.

47. A metaphor to highlight Defendants' inapt mode of analysis might be the contrast between a supermarket and a series of separate food shops. Shopper A might prefer to visit one store for meat and fish, another shop for fruit and vegetables, and a third for baked goods. Shopper B might prefer to do all his food shopping at a supermarket, under one roof. Similarly, Defendants argue that the Commonwealth has chosen, for the most part, to provide services to SED children through a variety of separate outlets: assessments through pediatricians; service coordination (when it occurs) through, for example, MBHP's "targeted outreach" workers; crisis services through a separate contracted ESP agency; and in-home support services through yet another contracted FST. MHSPY and CFFC offer examples of the under-one-roof, supermarket-style service provision mode, available only for a few SED children. This latter method of packaging service delivery may have certain strengths, Defendants argue, but is not mandated by federal law.

48. The evidence sharply rebuts Defendants' position in two ways. First, comprehensive assessments, effective service coordination, planned crisis intervention, and tailored in-home behavioral support services simply are not, as a practical matter, available anywhere, in any form, to thousands of children with SED in the Commonwealth. These services may appear on paper, but they are not reaching most of the plaintiff class members. Second, even where limited services exist, arbitrary cut-offs and lack of overall coordination greatly reduces or entirely eliminates their effectiveness.

49. Objective data on the three successful programs show that, generally, they improve outcomes for children with SED. Significantly, Defendants offered *no* data at trial, and appeared to possess no data—not a shred of objective outcome measurement—confirming the benefits of the programs and services they offer through MBHP. A review of how programs like MHSPY and CFFC tend to succeed explains why the Commonwealth's primary method of delivering services so often fails. This examination also demonstrates that compliance with the Medicaid

statute, and consequent improvement in the lives of thousands of vulnerable children, is not beyond the reach of Defendants. Indeed, they are already doing it.

### 1. *Mental Health Service Program for Youth (MHSPY).*

50. Begun in 1997 as a pilot program with funding from Medicaid, the Commonwealth, and the Robert Wood Johnson Foundation, MHSPY provides well-coordinated assessment and case management services, along with appropriate in-home supports without arbitrary time limits. These services improve clinical outcomes for children with SED and protect them from unnecessary removal from their homes.

51. Originally, MHSPY enrolled thirty children at a time in two sites in Cambridge and Somerville. Most of the children who enrolled in the MHSPY program had been hospitalized at some point, and more than half the children had been placed in residential facilities. Dr. Katherine Grimes, medical director of MHSPY, characterized the children in her program as multi-agency, multi-need children for whom other interventions had failed.

52. Since its inception, there have been extensive waiting lists for access to care through MHSPY. MHSPY addresses all of a child's mental health needs through the direct provision of services or by securing needed services through a contractor. All children who enter MHSPY are given a thorough assessment. Moreover, MHSPY provides·each child with an intensive clinical case manager, who oversees a multi-disciplinary team that includes the child's family, medical care-givers, and others involved in the child's life. This team creates a single treatment plan for the child; the plan includes provisions to address potential crises.

53. There are no artificial time limits on the duration of MHSPY's in-home sup-

ports and other clinical services; each child enrolled in the program receives services until the goals for that child have been achieved.

54. The outcome data for the Cambridge/Somerville MHSPY sites have been very impressive. Over six years, SED children in the program experienced a 50% reduction in hospitalization and residential treatment days. Foster care days declined from 1327 days in the year prior to enrollment to 317 days following enrollment. The program's expenditures on integrated care for participating children, estimated at approximately $4500 per child per month, are substantially less than the cost for usual treatment in the Commonwealth's uncoordinated, multi-agency approach to care.

55. In 2002/2003, the Commonwealth expanded the MHSPY program to an additional site, called "Tri–City," which serves the cities of Malden, Everett, and Medford. Now, MHSPY enrolls an roughly sixty additional children at these three sites.

56. Children who enter MHSPY are evaluated using the Child and Adolescent Functional Assessment Scale ("CAFAS"). The higher a CAFAS score a child has, the greater the degree of functional impairment. A score of 170 signifies maximal functional impairment.

57. Tri–City children have somewhat higher CAFAS scores upon enrollment than do the Cambridge/Somerville children; the Tri–City average is one hundred six, while the Cambridge/Somerville average is ninety-three. The Tri–City site includes a greater number of referrals from the Department of Mental Health, and the children who enroll in Tri–City are more likely to have a parent who suffers from a mental illness.

58. Despite these differences, preliminary data demonstrate that the positive trends visible in the Cambridge/Somerville MHSPY sites are emerging in the Tri-City site. The MHSPY program is universally recognized as a success by children's health professionals, including state mental health officials.

## 2. *Worcester Communities of Care.*[10]

59. Worcester Communities of Care (WCC) began in 1999, also as a pilot program. The WCC program enrolled children with higher degrees of functional impairment than any of the MHSPY sites; the average CAFAS score for a WCC child was roughly 135. Despite their level of disability, between October 2000 and June 2003, sixty-one percent of the children in WCC experienced an improvement. Children who showed an improvement in CAFAS scores, sustained this progress even after leaving the WCC program. In 2003, WCC became a CFFC site.

## 3. *Coordinated Family Focused Care (CFFC).*

60. CFFC, which began in July 2003, operates in five communities: Brockton, Lawrence, New Bedford, Worcester, and Springfield. It is only accessible to Medicaid-eligible children who receive mental and behavioral health services through MBHP.

61. Like MHSBY, CFFC prepares an individualized plan for each of its participants that focuses on keeping a child with his or her family and on helping the family cope with and improve the child's behaviors. If the child has other individualized plans, such as a special education plan through the school, CFFC will make sure that the various plans are coordinated.

The program also provides crisis planning, an intensive case manager, and workers who interact with the child in his or her home as often and for as long as needed. Each CFFC clinical team has a caseload of ten families; crisis intervention services are available on a twenty-four hour basis in the child's home. Finally, there is no time limit for a family's participation in the program: a child leaves the program only when he or she meets the program's discharge criteria.

62. Each of the five CFFC programs serves fifty children. Accordingly, only 250 children with SED have access to CFFC, and there are waiting lists for entry into the program. The eligibility criteria for enrolling in CFFC include a risk of placement in a twenty-four hour care facility and a minimum CAFAS score of one hundred. The average CAFAS score across all five CFFC sites is one hundred forty.

63. During the first sixth months of the CFFC program, CAFAS scores for 83% of the children enrolled improved; children also experienced a reduction in inpatient emergency episodes. The program is no more costly than the Commonwealth's system of multiple service providers. Although a small number of program participants fail to make progress, CFFC presents a powerful example of the effectiveness of adequate planning, service coordination, and in-home supports for SED children.

64. No financial, clinical, or administrative bar prohibits expansion of a MHSPY-type or CFFC-type program throughout most, if not all, of the Commonwealth. Of course, it is true, as witnesses connected with these programs were careful to point

---

10. WCC began in September 1999 as a program to deliver intensive home-based services to SED children in Worcester. In 2003, WCC became a contractor with MBHP to provide the CFFC program. Thus separate discussion of WCC has mainly been subsumed into the discussion of the CFFC program.

out, that any such expansion would require careful planning and could not follow any rigid pattern. Tailoring of services to the specific environment—sensitivity, for example, to the culture of each community being served—is required. With appropriate modifications, however, programs like MHSPY and CFFC could provide the reasonable range of clinical interventions to which the plaintiff class members are entitled to under the EPSDT provisions of the Medicaid statute. That such services are now provided to only a few hundred of the many thousands of Medicaid-eligible children in Massachusetts with SED evinces a clear violation of federal law.

65. By finding that programs like CFFC and MHSPY provide the planning, service coordination, and in-home support the plaintiff children are entitled to under the Medicaid statute, the court is not dictating that these services be provided through these specific programs, or in any particular manner. CFFC and MHSPY, however, offer clear examples of one way the Commonwealth might fulfill its responsibilities under the Medicaid statute. Defendants may choose to comply in other ways or by other means; they cannot, as they are currently doing, choose to deprive the vast majority of children with SED of adequate EPSDT services by claiming either that their existing, deeply flawed system is adequate, or that compliance with the Medicaid statute is beyond their grasp.

## F. Other State Agencies.

66. A child with SED, in addition to qualifying for MassHealth, may sometimes receive services from other Massachusetts state agencies, such as the Department of Mental Health or the Department of Social Services. It is well established that a state may not avoid its obligations under the Medicaid statute by attempting to augment services through a non-Medicaid agency. As one Court of Appeals has noted, "obligations under

Medicaid stand independent of any services available through [a] parallel state program." *Collins v. Hamilton*, 349 F.3d 371, 376 n. 7 (7th Cir.2003). It is significant, however, that, even if these services from other sources are examined, the package of clinical interventions available to a typical SED child in Massachusetts falls far short of what is medically necessary.

### 1. The Department of Mental Health (DMH).

67. DMH provides services to adults and children over the age of five. To be eligible for DMH services, a child must be (1) diagnosed with a serious mental illness or emotional disturbance that (2) lasts longer than one year and (3) results in the child's functional impairment. The testimony at trial confirmed the difficulty SED children face in trying to qualify for DMH services and the lengthy application period.

68. For children who do manage to enter its program, DMH employs ninety case managers, each responsible for a case load of approximately twenty children. Since only children who qualify for DMH services are eligible for DMH case managers, significant eligibility barriers and delays impede access to these services.

69. DMH programs are intended to treat chronic, severe mental or behavioral conditions. The evidence at trial confirmed that, despite a clinician's determination that a particular service is medically necessary, a SED child frequently will not have access to it because the Commonwealth houses the program in DMH, and many SED children are unable to satisfy the stringent eligibility requirements for service through that agency.

### 2. Department of Social Services (DSS).

70. DSS is the state child welfare agency. It serves only children who have been removed from their homes, or (in limited cases) children who are in present danger of removal from their home. All DSS children who qualify for MassHealth receive their mental health services through MBHP.

71. Within the first thirty days of being in DSS care or custody, DSS clinicians prepare a comprehensive medical evaluation. DSS children may receive family-based services, as well as the services of a case manager, who in some cases may be designated the child's legal guardian.

72. Children removed from their homes are placed in either foster care or residential programs. Medicaid funds are not available for room and board in foster care or for locating foster parents. Children in either residential placement or receiving an intensive form of foster care called Therapeutic Foster Care (with trained foster parents) may receive the services of the DSS program called Commonworks, which coordinates these children's care and services.

73. Because DSS services are only available to children who are in state custody, or in danger of such placement, DSS services are not available to the vast majority of Medicaid-eligible children with SED in the Commonwealth.

### G. Defendants' "Benefit Clarification."

74. In April 2003, in response to this litigation, MassHealth issued a "Benefit Clarification" intended to ensure that the Commonwealth appeared to be in compliance with the federal EPSDT regulations. (See PX 0283, DMA081085, "Summary of Red Ratings".)

75. The Benefit Clarification took the form of an EPSDT administrative and billing regulation change. It explained, in substance, that, following the effective date of the clarification, service providers could submit reimbursement requests for any medically necessary service on behalf of children, regardless of whether the service had a separate billing code under the relevant contract.

76. For example, Defendants' witnesses testified that if a clinician determined that a Medicaid-eligible child needed the FST program for longer that the three to six weeks for which it was typically authorized, after April 2003 the clinician could request approval of an extension pursuant to this new EPSDT regulation. Significantly, however, the Benefit Clarification lacked any details on the process, standards, or time-line for approval of needed services after its effective date.

77. MassHealth informed providers of the Benefit Clarification through a notice about amended billing guidelines; it did not issue any similar notice through its Network Alerts, the normal avenue for informing providers of administrative changes in service options. Moreover, the Commonwealth did not send notice of the clarification to service recipients or their families.

78. To the extent that this new regulation was a good faith effort by Defendants to ensure that children with SED would have access to all necessary medical services as the Medicaid statute requires, it was an utter failure. From the date of its promulgation through the time of trial, the clarification has never once been invoked. If the new regulation was merely a gesture, crafted to allow Defendants to appear in compliance with the Medicaid statute for purposes of this litigation, then the transparency of the effort only rendered the Commonwealth's deficiencies in the provision of EPSDT services to the plaintiff class more glaring.

79. It is well understood by anyone familiar with provision of Medicaid services—and confirmed by testimony at trial—that clinicians hesitate to prescribe treatments and services for Medicaid patients that are not specifically listed in billing codes. Dr. David Nace, Vice President and Chief Medical Officer of McKesson Health Solution in Pennsylvania, confirmed this obvious, practical reality. It is simply a fact that how a state constructs its billing procedures affects a clinician's inclination to prescribe the use of particular treatments. The more cumbersome or confusing the process for approving a certain service is, the less likely clinicians will be to use it. The failure of Defendants to provide any detail about how to use the Benefit Clarification to support actual provision of services effectively rendered it useless.

80. The testimony of Defendants' own mental health service providers confirmed this reality. Several MBHP contractors testified that, despite years of experience and intimate familiarity with the provision of mental health services to Medicaid-eligible children, they were entirely ignorant of the new EPSDT Benefit Clarification. They had heard nothing of it through trade groups or other organizations associated with children's mental health. Very significantly, as already noted, in the more than two years from the issuance of the Benefit Clarification to the trial in this case not a single clinician or agency *ever* applied for approval of a service under the new regulation.

81. The floundering Benefit Clarification effort casts an unflattering light on the state of services for children with SED in Massachusetts before April 2003. The Commonwealth's hasty and ineffectual initiative to dress up its EPSDT regulations provides strong evidence that Defendants'

themselves recognized their failure to comply with the statutory and regulatory requirements with respect to the on-going, long-term needs of children with SED.

## H. *The Named Plaintiffs.*[11]

82. A review of the named Plaintiffs' clinical histories, undertaken in light of the credible testimony of Plaintiffs' expert witnesses, reveals that Defendants' provision of medical care, particularly service coordination and in-home supports, did not meet the medical needs of these disabled children.

83. Most prominent in this evidentiary landscape was the absence of adequate recognition that the named Plaintiffs' serious emotional disturbances constitute chronic conditions that require continuous monitoring, coordination, and modification of services. In most cases, the named Plaintiffs received short-term care in their homes after crisis episodes and, once the immediate flare-ups stabilized, found themselves with inadequate resources until their next, inevitable emergencies. In the worst cases, a child was terminated from a program due to arbitrary time limits despite clinicians' warnings of the child's on-going need for the services. Sometimes the terminated program was making a real difference in the child's life; these arbitrary terminations risked, and at times precipitated, regression and needless institutionalization.

### 1. *Plaintiff Anton B.*

84. Anton is a twelve-year-old boy who lives at home with his mother. Anton was born prematurely and received early intervention services until the age of three. When he was four, Anton was diagnosed with attention deficit hyperactivity disor-

---

11. As noted earlier, the status of each of the named Plaintiffs is considered as of September 2004; ages are given as of the time of trial.

der and at age seven, with bipolar disease. Anton received some treatment based on these various diagnoses.

85. By the age of nine, Anton had been hospitalized three times. Following his second hospitalization, Anton received FST services and support from a behavioral specialist, who took him on outings twice a week. FST services terminated after one month, and the specialist terminated after eight months, despite requests from Anton's mother and from his clinicians that the specialist service be continued.

86. Four months after the specialist service ended, Anton was hospitalized again. Anton's hospital discharge summaries recommended intensive home-based services, including development of a behavior management plan and in-home behavior therapy. The services recommended on discharge were not adequately provided.

87. Since 2001, Anton has received some individual therapy, medication, check-ups once or twice a month, and after-school programming. Case management services, received from DMH, comprise approximately six hours *annually*—completely inadequate for someone of Anton's level of need. Anton has also received only special education support from his school.

88. Anton currently needs in-home supports, more intensive case management services, a behavioral specialist to work with him and his mother, mobile crisis management, a therapeutically-based after-school program, and individual or family therapy in his home or community. At present Anton is not receiving such services and is therefore at risk for another hospitalization.

### 2. *Plaintiff Devin E.*

89. Devin is an eleven-year-old boy who lives at home with his grandmother. He began receiving early intervention services at age 2, and has been receiving therapy and medication since the age of four. Devin has multiple diagnoses, including post-traumatic stress disorder, reactive attachment disorder, and possible bipolar disorder.

90. The absence of adequate service coordination has resulted in conflicting diagnoses of Devin's problems and unresolved disputes over appropriate treatments. Some clinicians maintain that Devin is autistic and have designed courses of therapy around this diagnosis. Devin's grandmother has rejected this diagnosis; she asserts that he is capable of functioning at a higher level than most autistic children. The grandmother's opinion is buttressed by an assessment of Devin performed by psychologists from the Children's Hospital in Boston, who have opined that Devin has post-traumatic stress disorder and global developmental delay. Several clinicians have recommended residential care for Devin, but his grandmother is determined to care for Devin at home, and has therefore consistently requested in-home supports.

91. Intensive in-home supports have been recommended frequently as a treatment for Devin, twice in hospital discharge recommendations and once by Devin's treating psychiatrist. Moreover, Devin's health care clinicians have stated repeatedly that his treatments and services need to be coordinated in order to assure continuity and consistency.

92. Clinicians first recommended "intensive home-based services" for Devin in 2000 after his assessment at Children's Hospital. Nonetheless, no adequate in-home behavioral support or service coordination was provided for nearly three years. In 2003, after this lawsuit was filed, Devin's psychiatrist recommended in-home supports similar to those sought by his

grandmother. A clinician also proposed a detailed treatment plan for such services.

93. Devin's psychiatrist contacted MBHP with the assistance of class counsel, and as a result of this pressure some of the services requested (at less than the recommended intensity) were provided. Devin now has an intensive clinical manager from MBHP, as well as case management services from other agencies. In addition to these services, Devin began receiving services from a FST behavioral specialist in November 2003, and a one-to-one aide, as well as speech and occupational therapy at school.

94. While Devin has received more services than most SED children, gaps continue to plague his treatment. The MBHP case manager, for example, has never met with Devin. No in-home supports exist to cover the weekends, when the boy's complex needs place pressure on his grandmother.

95. A review of Devin's treatment profile presents a dual picture: on the one hand, a history of insufficient services (particularly, adequate case management and on-going home supports) that continues, to some extent, to this day; on the other hand, better than average services, combined with the extraordinary commitment of his grandmother, have kept Devin out of an institution, allowed him to attend school, and given him the support to earn A's and B's. Though Devin is currently receiving many of the services he needs, they continue to fall short of the level of intensity recommended by Devin's psychiatrist. In sum, though Devin is better served than most children with SED in the Commonwealth, in part because of the intervention of counsel, his medical needs still are not being met.

### 3. *Plaintiff Jerry N.*

96. Jerry is a twenty-year-old male who lives at home with his mother. His diagnoses include mood disorder, attention deficit hyperactivity disorder, mild retardation, and a chromosomal abnormality associated with a short attention span. Jerry has received special education services since an early age, as well as outpatient therapy and medication management.

97. Jerry's first hospitalization occurred at fourteen; so far he has attended three different specialized schools. Although Jerry tends to perform better academically at these structured facilities, one terminated his enrollment because it lacked the clinical and programmatic support necessary to ensure his safety and the safety of other students.

98. In the past, clinicians have recommended case management and in-home behavioral services for Jerry. Requests for services from both DMR and DMH were unsuccessful. He did receive some CSP services toward the end of 2003, but these services ceased after only six months.

99. Jerry's reasonable medical needs—notably case management services and behavioral supports in his home and the community—have not been met by the Commonwealth's Medicaid program, despite his eligibility for such services. He has a present need for a case manager and home supports that include crisis services in the home as well as a one-on-one behavioral specialist who visits two or three times per week.

### 4. *Plaintiff Joshua D.*

100. Joshua is a fifteen-year-old boy who lives at home with his adoptive parents. He has been diagnosed with obesity, Asperger's Syndrome, anxiety disorder, and pervasive developmental disorder. Josh also suffers from a nonverbal learning disorder and fine motor problems associated with his weight.

101. Joshua has experienced two out-of-state placements. Although Joshua has received a variety of services—including CSP services from MBHP, psychiatric services, medication, physical therapy, a crisis team, and a health worker who has taken him on outings and worked on his social skills—he lacks adequate service coordination to ensure that his various providers are working towards a common goal.

102. Joshua was found eligible for DMH services, but was placed on a wait list for case management services. In March 2005, a month prior to the start of trial, MBHP finally assigned an intensive case manager to Joshua's case.

103. Joshua needs, but has not received, a range of services including behavioral supports in the home and individual and family therapy, coordinated by a single case manager. In sum, Defendants have not provided Joshua, thus far, the treatment that Congress intended in promulgating the EPSDT provisions of the Medicaid Act.

### 5. *Plaintiff Roselin D.*

104. The lead Plaintiff, also known as "Rosie," is a sixteen-year-old girl who has been diagnosed with bipolar disorder, post-traumatic stress syndrome, oppositional defiant disorder, dyslexia, and attention deficit hyperactivity disorder. Until about age four, when she was removed from the care of her parents, Roselin experienced severe physical and sexual abuse.

105. Roselin has suffered repeatedly from poorly coordinated services, which have led to an overlay of additional symptoms generated by her intervals of institutionalization. For example, at the end of 1994, when she was six years old, Roselin was hospitalized for three months, during which her treating clinicians noted a severe regression in her condition.

106. To coordinate Roselin's care, her foster mother has acted as case manager. She has directed a crisis plan, established interagency meetings, demanded transition plans where appropriate, worked to schedule community support workers, and arranged other programs for Roselin.

107. In early September 2004, Roselin was living at home with her foster mother and receiving community support services, respite, tutoring, summer camp, and therapeutic recreational activities. However, later that month, Roselin was repeatedly violent towards her foster mother, culminating in an episode which resulted in her admission to a Crisis Stabilization Unit. As a result of this incident, as of September 2004, Rosie was being considered for therapeutic foster care.

108. Roselin is now at risk for a placement outside the home, even though both her present therapist and case manager have opined that residential placement would be detrimental to Roselin: they have recommended placement in therapeutic foster care during the week with visits home on the weekends. The physician who monitors her medication, however, has suggested that the best course of treatment would be a residential placement, since Roselin's condition has been deteriorating precipitously in the face of the challenges of adolescence.

109. Roselin's treatment history presents a familiar picture of inadequate home supports and arbitrary limitations on services. By September 2004, even after years in the Commonwealth's mental health system, Roselin's current needs were unclear and her prospects uncertain.

### 6. *Plaintiff Shaun E.*

110. Shaun is a nine-year-old boy who lives at home with his grandmother and his seventeen-year-old uncle. He experienced abuse and neglect until he and his two sisters were removed from their parents and placed with their grandmother.

Because of the threat Shaun's behavior posed to his two younger sisters, however, the state eventually removed the sisters from his grandmother's care. Shaun has been diagnosed with pervasive developmental disorder, mood disorder, attachment disorder, and attention deficit hyperactivity disorder. In addition, Shaun has a seventy-percent hearing loss in one ear as well as speech and other neurological problems.

111. For over two years, Shaun participated in a program called Foundations, whose services his grandmother found indispensable. However, in 2004, Foundations' services terminated because Shaun had reached the program's two-year time limit. Shortly thereafter, Shaun was hospitalized: the treating clinicians found that Shaun's functional decline was directly related to the stress he endured from losing the Foundations' life coaches.

112. As part of his discharge plan from the hospital, Shaun was supposed to receive services from FST; these services, however, were not provided in a timely fashion. Shaun was institutionalized again several weeks later.

113. At the time of trial, Shaun was in a day program at a residential school. The school provides medical, nursing, case management, and group therapy to Shaun. Although his grandmother is pleased with the services Shaun receives at the school, neither she nor Shaun has access to any services outside school. Shaun has a clear medical need for in-home behavioral support services and a well-coordinated mobile crisis service that can come to the home in emergencies.

114. The lack of in-home behavioral supports, including increased hours from a behavior specialist, pre-planned crisis services, and case management, has put Shaun at risk of unnecessary hospitalization. His current, unmet reasonable medical needs include case management and expanded one-on-one behavior support in the home.

### 7. *Plaintiff Sheena M.*

115. Sheena is a nineteen year-old female who lives at home with her father. She has been diagnosed with mild to borderline metal retardation, mild symptoms of psychosis, schizophreniform disorder, and non-specific anxiety. Sheena has experienced a lack of service coordination that has led to disputes about her diagnoses. Moreover, her treatment regimen reflects delay, confusion, and disagreement among the providers attempting to treat her.

116. Sheena was finally placed in a residential home in September 2001, where she stayed for two years. In 2003, Sheena's clinicians began preparing to transition her out of the residential program and back to her family home. It became obvious during this process that Sheena would need case management services to make this change successfully. As a result of her participation in this litigation, in January 2004 (while still in the residential program) Sheena received an intensive clinical manager from MBHP.

117. As part of the planning for her discharge from the residential placement, Sheena was offered time-limited FST services. Recognizing that a premature cutoff of these services was a recipe for failure, Sheena's father, her clinical manager, and her therapist all rejected the FST program as inappropriate in light of Sheena's reasonable medical needs.

118. Sheena thereafter encountered further delays in her return home, based not on her medical needs, but rather on a dispute between DMH and the Department of Mental Retardation ("DMR") over who had financial responsibility for Sheena's care.

119. Sheena's therapist has predicted that Sheena's placement in yet another residential setting might lead to further deterioration of her condition. She currently receives psychiatric support, as well as case management services from other agencies, therapy and respite.

120. Sheena is at risk for a restrictive placement and needs a single treatment team, therapy, and more intense home supports, including a one-on-one behavior specialist, as well as ongoing medication and case management. Despite the clear medical necessity, MassHealth is not adequately providing the services required.

### 8. Plaintiff Tyriek H.

121. Tyriek is an eleven year-old boy who lives in a DMH-contracted residential program. He has been diagnosed with schizoaffective disorder and receptive and expressive learning disorders. His record suggests that he may also suffer from a psychosis related to a major mental illness, although his mother disagrees with this diagnosis.

122. In May 2000, Tyriek was deemed eligible for DMH service and was placed on a waiting list for case management. Tyriek did not meet his case manager until February 2001. An evaluation in June 2000 recommended that Tyriek's parents receive support, including a therapist and crisis intervention services, to contain his behaviors at home. Tyriek received FST services, but when those were cut off July of 2000, Tyriek's condition rapidly deteriorated.

123. As a result of Tyriek's increased need for services he was placed out of his home in September 2000 into a residential crisis intervention unit for two months. After this crisis admission, Tyriek's mother asked for services that would allow him to live at home, but the only option presented was a transfer to a residential program. Ultimately, Tyriek was discharged from the CSU into an intensive residential treatment facility, where he remained for the next three years, from age seven until age eleven.

124. During his years in the residential program, Tyriek went on several home-visits to see his mother and family members. These visits were a burden on both Tyriek and his family because the residential school was far from Tyriek's home and required long van trips. Though the contacts with his family frequently were successful, Tyriek's often had difficulties with the extended van rides required.

125. In 2004, Tyriek improved to the point where clinicians began to consider a less-intensive residential placement, and Tyriek was transferred to a new residential facility.

126. Tyriek's mental illness is particularly severe. Though it is possible that he would have eventually ended up in his current residential placement, the services he received prior to this placement were inadequate, both as to duration and intensity. Currently, Tyriek is disabled to the point where an at-home placement for him would likely require virtually round-the-clock assistance. Thus, while there is no current need for case management and home supports, if Tyriek continues to improve in his new, less-intensive residential placement, he and his family will require these services in the future.

### I. Clinical Review

127. In addition to presenting the case histories of the named Plaintiffs, Plaintiffs' experts performed a clinical review of the needs of a randomly selected subgroup of the certified class, to determine whether the reasonable medical needs of this group were being met. This review examined the histories of thirty-five children who receive behavioral health services through MassHealth.

128. The clinical review, even with its limitations, provides substantial, useful information regarding the unmet medical needs of the plaintiff class. The children were selected from a list of 3226 Medicaid-eligible children with SED who had received mental health services during two specified time periods. This list was drawn up and given to Plaintiffs' experts by Defendants; it provided the pool for the random selection.

129. Several trained clinicians, familiar with the medical needs of SED children, examined the clinical history of the sample children on behalf of Plaintiffs. Their review revealed that, in general, the thirty-five sample children suffer from similar conditions as the named Plaintiffs but have inadequate access to necessary medical treatment. Like the named Plaintiffs, the children in the clinical review usually had multiple diagnoses—most involving at least one serious mental illness—complex symptoms, and chronic needs. All the children were involved with the state's mental health system in some way.

130. Ninety percent of the children in the clinical review confronted substantial deficiencies in their medical treatment. Particularly glaring were the absence of comprehensive assessment, adequate case management, and in-home supports such as mobile crisis services and behavior specialists.

131. Service deficiencies suffered by the thirty-five SEDS children randomly selected for analysis followed the same pattern as those encountered by the named plaintiffs. A few examples illuminate the parallels. The treatment plan of one child, "Robbie," comprised a single page form, virtually identical year to year. Case management services were recommended for Robbie; eight months later he was still waiting to get them. Another child, "Matthew," needed intensive, home-based behavioral support services; the time-limited, sporadic services he received were insufficient to head off his hospitalization. A third child, "Dawn," needed prompt assessment by a crisis intervention team; delays resulted in her transportation to a psychiatric facility forty miles from her home. Lack of a bilingual behavioral specialist to provide support and assist in a transition to a foster home left a fourth child, "Christine," isolated in a residential program far from her Latino community.

132. Defendants' criticisms of the clinical review, directed at sample size, absence of academically approved standards of randomization, and possible reviewer bias failed to undercut the import of the evidence provided by the review: SED children in the Commonwealth are not receiving the medical services that are reasonable necessary to address their disabilities. With infinite funds, infinite time and infinite access to data, perhaps a more technically sound study might have been fashioned. As one portion of the evidence offered by Plaintiffs, however, this study—even with its limitations of time and cost—vividly supports Plaintiffs claims. Significantly, Defendants, with vastly better access to the data than Plaintiffs, attempted no study of their own as rebuttal. They did not, and apparently could not, offer any objective information on services actually provided to any specific sample of SED children.

133. None of the named Plaintiffs, or the SED children included in the clinical review, has received services from either the Mental Health Services Program for Youth (MHSPY) or Coordinated Family–Focused Care (CFFC) program. It is a fair inference from the evidence that, if they had, many would be doing far better now.

### J. "Stuck Kids"

134. The Massachusetts Behavioral Health Partnership tracks the number of children, sometimes referred to as "stuck kids," who remain in hospitals without clinical justification simply because they have no where else to go. Any day spent in a hospital that is not medically necessary is called an Administratively Necessary Day ("AND"). Named Plaintiffs Rosie D. and Sheena M. experienced days as "stuck kids" because of a lack of appropriate services.

135. Between 1998 and 2003, the number of children in hospitals for ANDs rose from an average of thirty-two children per year to one hundred thirty-eight. One-third of the children on MBHP's list were stuck for over one hundred days. As Plaintiffs point out, these statistics only pertain to MBHP's services (not the other four MassHealth plans) and do not include children stuck in unnecessarily restrictive residential placements other than hospitals.

136. It is true, as Defendants point out, that some ANDs may always be a part of any system attempting to address the needs of seriously disturbed children with extreme dysfunction. On the other hand, the steady increase in these days was not explained by anything other than a lack of adequate services. Moreover, the evidence is overwhelming that children with SED who receive adequate case management and home support services are less likely to experience acute episodes that require the most restrictive placements. The failure of Defendants to comply with Medicaid's EPSDT requirements for SED children explains, in significant part, the state's burgeoning "stuck kid" problem.

### IV. CONCLUSIONS OF LAW

■ Plaintiffs have properly invoked 42 U.S.C. § 1983 to enforce rights conferred on them by the Medicaid Act. *See*

*S.D. ex rel. Dickson v. Hood,* 391 F.3d 581, 604 (5th Cir.2004) (noting that numerous courts have concluded that the Medicaid Act confers a federal right to EPSDT services on eligible children and that these rights are enforceable under § 1983); *Doe 1–13 ex rel. Doe, Sr. 1–13 v. Chiles,* 136 F.3d 709, 718–19 (11th Cir.1998) (holding that the "reasonable promptness" provision of the Medicaid statute gives rise to a federal right that the plaintiffs may seek to enforce in federal court); *Stanton v. Bond,* 504 F.2d 1246, 1251 (7th Cir.1974) (affirming the provision of injunctive relief in suit brought under § 1983 to enforce EPSDT rights).

Based on the facts summarized above, the court concludes that Defendants have violated the EPSDT provisions of the Medicaid Act by failing to offer necessary medical services to children in this Commonwealth who suffer from serious emotional disturbances. Moreover, they have failed to perform their statutory obligation to furnish these medical services with "reasonable promptness."

■ The failure to provide required EPSDT services took several forms.

■ First, the EPSDT provisions of the Medicaid statute require, by their very language, comprehensive assessments of children with SED. It is self-evident that "early and periodic screening, diagnostic and treatment" services are impossible without a competent analysis of a child's clinical needs. For the majority of SED children in the Commonwealth, assessments take place in name only, or not at all. The assessments that are attempted often lack comprehensiveness and frequently are not incorporated into any long-range treatment planning.

Second, to address the complex needs of this particularly vulnerable population, clinical oversight—that is, ongoing case management and monitoring—will almost always constitute an essential component

of any treatment regimen. The solid weight of the evidence establishes that a great number of Medicaid-eligible children with SED badly need, but are not being provided, adequate case management services in the Commonwealth. Except in the MHSPY and CFFC programs, no trained individual meets regularly with the child and family, oversees formulation of a treatment plan, and takes responsibility to ensure that the plan is carried out and modified as the child's needs evolve. This medically necessary service is, for the most part, unavailable to SED children in Massachusetts.[12]

Third, the EPSDT provisions of the Medicaid statute require provision of adequate in-home behavioral support services for SED children. Defendants have failed to provide adequate in-home supports, which include trained personnel—paraprofessionals or licensed clinicians—who can assist the child and his or her family in the home for as long as medically required. This bundle of in-home supports must also include crisis services, available on short notice and designed to minimize the need to remove the child from the home. Again, these services are often simply not available for an adequate duration at an adequate level of duration and intensity.

It is true, as Defendants point out, that they do provide some case management and in-home support services to a few of the Commonwealth's Medicaid-eligible SED children. For most SED children, however, Defendants provision of services amounts to an attempt to patch together long-term care out of short-term programs. For most SED children, this will not work. Though short-term programs have their uses, they are inadequate by themselves to treat children with chronic conditions, who usually require carefully planned and flexible services for months or years. The absence of these long-term services too often leaves SED children with only one option: expensive, clinically unnecessary and damaging confinement in a long-term residential program or hospital, far from home and family.

 Because Defendants have failed to meet the substance of the EPSDT mandate, they have not satisfied Congress' command to provide services with "reasonable promptness." 42 U.S.C. § 1396a(a)(8). The fact that Defendants provide some services does not relieve them of the duty to provide all *necessary* services with reasonable promptness. *Boulet v. Cellucci,* 107 F.Supp.2d 61, 79 (D.Mass.2000).

 Finally, as noted in the introduction, the evidence does not support Plaintiffs' claim that Defendants have violated the equal access provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A). This subsection is intended to prevent "gross disparity" between the Medicaid population and the general population with respect to the availability of medical assistance. *See King v. Sullivan,* 776 F.Supp. 645, 655 (D.R.I.1991). No significant evidence describes barriers to providers enlisting in the state's Medicaid system or suggests significant differences between the provision of care for SED children in the general population as compared to those in the Medicaid-eligible population.[13]

---

12. Defendants object that appointment of a case manager with responsibility for monitoring an SED child's overall treatment is not possible, since SED children often receive services from non-Medicaid providers, such as DMH and DSS. Defendants cannot, however, justify denying SED children access to necessary treatment by citing barriers they

have chosen to erect in their own system of treatment.

13. The Ninth Circuit recently held in *Sanchez v. Johnson,* 416 F.3d 1051 (9th Cir.2005), that the equal access provision is not enforceable in a § 1983 action by Medicaid recipients or providers. In so holding, the court followed

The failure of Defendants to comply with the EPSDT and "reasonable promptness" provisions of the Medicaid statute will require the court, unless voluntary remedial action is taken, to issue permanent injunctive relief to prevent continued, irreparable harm to the plaintiff class members. Ongoing denial of necessary medical services to Plaintiffs outweighs any harm to Defendants that would flow from such an injunction. Moreover, equitable relief to ensure compliance with the Medicaid statute would obviously serve the public interest.

### V. *CONCLUSION*

For the reasons set forth above, the court hereby finds in favor of Plaintiffs, on the issue of liability, on Counts I and II. The court finds in favor of Defendants on Count III. Because the issue of remedy remains to be addressed, judgment will not enter at this time, and no action by the clerk in this regard is required.

The parties are ordered to meet within fourteen days of this memorandum to discuss the issues to be addressed in the remedy phase and to attempt to agree on a timetable for doing so. On or before February 17, 2006, counsel will submit their written proposal regarding both the issues and timetable, either jointly or, if they are unable to agree, then separately. Counsel will appear again for a status conference to discuss the remedial phase on February 23, 2006 at 3:00 p.m.

It is So Ordered.

the reasoning of the First Circuit's decision in *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50 (1st Cir.2004), in which the court determined that Medicaid *providers* could not enforce the equal access provision through a § 1983 action. Even were the First Circuit to extend its *Long Term Care* decision to Medicaid recipients as the Ninth Circuit has done, the results would be the same in this case, since the court has found no violation of the equal access provision by the defendants. As already noted, courts have regularly recognized the availability of § 1983 to enforce the EPSDT provisions of the Medicaid statute. *Cf. S.D.*, 391 F.3d at 603 (concluding that "the EPSDT treatment provisions of the Medicaid Act contains the 'rights-creating language critical to showing the requisite congressional intent to confer a new right'") (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 274, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002)).