NOT DESIGNATED FOR PUBLICATION

No. 118,489

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Guardianship of E.C.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Miami District Court; STEVEN C. MONTGOMERY, judge. Opinion filed July 6, 2018. Affirmed.

*Mark D. Lewis*, of Gardner, for appellant father.

*Lewanna Bell-Lloyd*, of Olathe, for appellees, maternal grandparents, and *Amy Winterscheid*, of Paola, guardian ad litem.

Before STANDRIDGE, P.J., GREEN and MCANANY, JJ.

PER CURIAM: D.P., the mother of E.C., died when E.C. was just six years old. About a week after D.P.'s death, E.C.'s maternal grandparents petitioned the court for guardianship of E.C., alleging that E.C.'s biological father was unfit. Following a three-day trial, the trial court granted Grandparents' petition for guardianship because it found that D.C. was incapable of providing for E.C.'s essential needs. On appeal, D.C. raises three arguments: (1) that Grandparents' petition failed to state a claim entitling them to relief; (2) that the trial court failed to follow the parental preference doctrine; and (3) that the trial court failed to support its unfitness findings with clear and convincing evidence. For the reasons stated later, we reject these arguments. Accordingly, we affirm the trial court's granting of Grandparents' petition for guardianship.

1

On August 9, 2016, the maternal grandparents of E.C., petitioned the court to be appointed as E.C.'s guardians. D.P., E.C.'s mother, had died of cancer on July 28, 2016. Grandparents alleged that they were fit to serve as E.C.'s guardians partly because E.C. had been living with them since she was six months old. Grandparents also asserted that D.C., E.C.'s biological father, had no bond with E.C. and that he was unable to care for E.C. They further asserted that D.C. was an unsuitable natural guardian for the following reasons: (1) he was a registered sex offender; (2) he was not providing care for E.C.; (3) he was allowed to visit E.C. only with supervised access; and (4) he was not exercising his visitation rights. Based on the preceding, as well as D.P.'s death, Grandparents maintained that it would be "psychologically damaging to [E.C.]" to be placed with D.C.

Shortly after Grandparents filed their petition, the trial court entered ex parte temporary orders appointing Grandparents as temporary guardians because they were fit and because D.C. was a registered sex offender who had "not cared for [E.C.] during her life." The trial court also appointed a guardian ad litem (GAL) on behalf of E.C.

On September 18, 2016, D.C. responded that he was contesting Grandparents' petition because he was capable of caring for E.C. D.C., however, admitted that he had committed previous criminal and moral offenses and that he was a registered sex offender. Documents in the record on appeal establish that D.C. was charged with five counts of rape and two counts of aggravated criminal sodomy in Johnson County No. 11 CR 0933. D.C. had filmed himself performing sex acts on his ex-girlfriend on five different occasions between October 2010 and January 2011 while his ex-girlfriend was unconscious because of heavy drinking. The ex-girlfriend had no knowledge of either the sex acts or the films. D.C. eventually pled to two counts of aggravated sexual battery. In February 2012, the trial court sentenced him to 36 months' probation followed by lifetime postrelease supervision. The trial court also notified D.C. of his duty to register as a sexually violent offender for 10 years.

In addition to alleging that he was capable of caring for E.C., D.C. argues in his motion that Grandparents' "petition fail[ed] to state a claim upon which relief could be granted." At the outset of the trial on Grandparents' petition, D.C. reiterated that Grandparents' petition failed to state a claim upon which relief could be granted. D.C. asserted that Grandparents were required to allege that E.C. was without "sustenance, shelter, [or] personal hygiene" to state a claim entitling relief. Grandparents countered that they had stated a claim entitling them to relief for the following reasons:  by noting the psychological harm E.C. was likely to suffer if placed in D.C.'s care and by noting that D.C. was a registered sex offender. The trial court ruled in favor of Grandparents, denying D.C.'s motion because parental unfitness in guardianship cases touches on whether the natural guardian has "moral degradation issues."

Next, Grandmother; Mark Steiner—who was E.C.'s therapist; S.C.—who was D.C's current wife; and D.C. testified. The trial court heard this testimony over a span of three days—April 11, 2017, April 13, 2017, and May 16, 2017.

Grandmother testified that D.P. moved back into her and Grandfather's house when E.C. was under six months old. Grandmother explained that after D.P. and E.C. moved in, she would help D.P. care for E.C. In 2014, however, D.P. was diagnosed with cervical cancer. She explained that once D.P. became ill, she helped D.P. even more than before with E.C.'s care. Grandmother testified that since the final weeks of D.P.'s two-year battle with cancer, she had been the primary caregiver for E.C.

Grandmother stated that since D.P.'s death, E.C.'s behavior had changed. She explained that E.C, who was in second grade, gets into trouble at school. E.C. now has an individualized education plan program. Moreover, E.C. does not have as many friends as she once had before D.P.'s death. According to Grandmother, she decided E.C. needed therapy after noticing these changes. Grandmother also asserted that E.C.'s behavior

3

worsened as the guardianship proceedings progressed. She asserted that E.C. would have outbursts of bad or concerning behavior following visitations with D.C.

One of the outbursts of concerning behavior occurred during D.C.'s visitation with E.C. D.C. and S.C. have two young daughters. Evidently, during a trip to Chuck E. Cheese's, E.C. went up to her three-year-old sister and asked her if she was wearing underpants. When her sister said she was wearing underpants, E.C. told her to pull her pants down because she wanted to see her sister's underpants. This incident ended with her sister running off in tears. E.C. also hit other children and called people names at the entertainment center.

Concerning D.C.'s involvement in E.C.'s life, Grandmother explained that D.P. and D.C. were married very briefly in March 2010 before having their marriage annulled. D.C. was in jail during the spring and summer 2010. Grandmother further explained that because of D.C.'s criminal case, D.C. had very little contact with E.C. during the first couple of years of her life. She testified that starting when E.C. was about three years old, D.C. would see E.C. about five to six times a year during supervised visits. Grandmother asserted that D.C. rarely called E.C. on the phone. She explained that D.C.'s inconsistent contact with E.C. had continued since the filing of the petition for guardianship. Because of E.C.'s inconsistent relationship with D.C., Grandmother believed it would cause E.C. psychological harm to be placed with D.C.

Steiner testified that he was a Licensed Specialist Clinical Social Worker who had provided therapy for children for nearly 25 years. He testified that he was concerned about E.C.'s "psychological and emotional reactions to the death of her mother." He explained that in the three sessions he had with E.C. over the past three months, he observed that she had some boundary issues and potential difficulties telling the truth. He testified that in the last session E.C. "made a reference toward herself being part of taking her mom away." He explained that from the sessions he had with her so far, he believed

4

that E.C. was "havin[g] a hard time right now" handling the death of her mother. He explained that removing E.C. from Grandparents' home may result in E.C. developing "maladaptive" behaviors, especially since E.C. was having a "hard time" already. Steiner testified that signs of maladaptive behavior include deteriorating peer relations and performance in school. He explained children with maladaptive behavior also are more likely to engage in self-harming behaviors or become runaways.

Steiner testified that because Grandparents have been E.C.'s primary caretakers and because of D.C.'s limited contact with E.C., he believed "that it would be very detrimental if [E.C.] was removed from that environment at this time." He further stated that the most important things for E.C. given the death of a "significant family member," were "consistency" and "structure." He explained that moving E.C. from Grandparents' house to D.C.'s house could result in long term psychological harm. Also, Steiner explicitly testified that E.C.'s "health, safety, and welfare" would be promoted if very few changes were made, including changes in her primary caregivers or school.

Concerning E.C.'s psychological needs, S.C. testified that she recognized E.C needed help, although she admitted that she did not "even know [E.C]" in regards to her behaviors and emotions because she had not lived with her. S.C. testified that she and D.C. had prepared for E.C. coming home with them by calling the local school a week earlier and by ensuring that they had a school counselor. S.C. testified that she and D.C. planned to refer to E.C. by her full name, even though E.C. has gone by a nickname her entire life.

When asked about Steiner's testimony that it would be psychologically damaging to remove E.C. from Grandparents given the difficulties she was having adjusting to her mother's death, D.C. testified that he wanted E.C. to come home with him anyway because he was "her father and [had] a right to raise [his] daughter." He testified that he had contacted a counseling center in Topeka, Kansas, where he and S.C. currently lived,

5

indicating that E.C. would go to this center should the trial court deny Grandparents' petition.

D.C. admitted that he had only contacted Steiner about E.C.'s current therapy sessions once, the day before his April 13, 2017 testimony. D.C. indicated that if the trial court denied Grandparents' petition, he was not sure if he would allow E.C. to continue a relationship with Grandparents. Specifically, Grandparents' attorney and D.C. had the following exchange:

> "[Attorney:] If the Judge would say, well, [D.C.], you can take [E.C.] home today, what are proposing as far as when [E.C.] sees her grandparents?
> "[D.C.:] I haven't decided that. I don't know the answer to that is what I meant. I don't know. I don't know the answer to that.
> "[Attorney:] Sir, do you think it's important that [E.C.] maintain a close bond with her grandparents based on the testimony of Mr. Steiner?
> "[D.C.] That wasn't Mark Steiner's testimony. It's a matter of *my feelings* with my daughter seein' her grandparents, because it is—should be—It should happen because we're goin' to try and raise the child together. It's important for a seven-year-old to be loved by both sides.
> "[Attorney]. But it was not something important enough for you even to come up with a specific plan before you came in here today?
> "[D.C.:]. I don't know how to answer that." (Emphasis added.)

As Grandparents' attorney continued to press D.C. on whether he would allow Grandparents' visitation, D.C. provided nonresponsive answers. When asked if he had followed up with Steiner to see how E.C. was doing in therapy during his May 16, 2017 testimony, D.C. testified that he had not contacted Steiner except for the one time before his April 13, 2017 testimony.

In regards to what school E.C. would attend should she live with him, on April 13, 2017, D.C. testified that he had contacted a school that he wanted E.C. to attend. This

6

would be a different school from the one she currently was attending. D.C. implied that he would place her in the new school immediately instead of letting her finish the school year at her current school. He admitted that the school he intended to place her in immediately would be closing at the end of the year and combined with another school. When asked about E.C.'s current school, D.C. admitted that he had never contacted her current school to ask how E.C. was doing or discuss her current school needs. In fact, D.C. did not even know what school E.C. attended. D.C. admitted that he still had not contacted E.C.'s school on May 16, 2017.

Concerning D.C.'s criminal history, when S.C. was asked if D.C.'s aggravated sexual batteries were concerning to her since S.C. and D.C. have two young daughters together, S.C. responded, "If that's what really happened." After further questioning, S.C. explained that D.C.'s criminal history did not concern her because D.C. was sorry about his past crimes. She testified that when she observed E.C. and D.C. together, she never had concerns about D.C.'s parenting skills. D.C. was always appropriate and affectionate with E.C.

When questioned about D.C.'s relatives who had committed sex crimes, S.C. admitted that she knew some of D.C.'s family members were registered sex offenders, but she testified that she did not know what they did to become registered sex offenders. S.C. explained that this was not concerning to her because (1) she always watches her children when D.C.'s family is around and (2) she only sees D.C.'s extended family a couple times a year. When pressed, S.C. admitted that at their former property in Powhattan, Kansas, D.C.'s brother, who was a registered sex offender, lived on their property in a camper for three months in 2014; D.C.'s nephew lived with D.C's mother on the neighboring property.

D.C. confirmed that his brother was a registered sex offender who lived at the Powhattan property. D.C. denied staying in regular contact with his brother, although he

7

admitted that he had stated that he stayed in contact with his brother at his deposition. D.C. clarified his deposition testimony by stating that he only stays in contact with his brother by phone. D.C. additionally confirmed that his nephew lived with his mother. D.C. acknowledged that his nephew was a registered sex offender because he had "sex with [a child] under [the] age of 14."

Through the divorce case, the court created a parenting plan where D.C. was entitled to supervised visits with E.C. every other week. This plan was in effect when D.P. died. D.C. testified, however, that in 2014, he visited E.C. a total of eight times. In 2015, he visited E.C. a total of eight times. Moreover, in 2016, he visited E.C., a total of two times. He testified that he visited E.C. only two times in 2016 because D.P. was unable to drive E.C. to the visitations, so his visitations with E.C. were canceled. At the May 16, 2017 trial date, D.C. eventually admitted that he had exercised his visitation rights only five times so far that year.

Moreover, D.C. admitted that during E.C.'s lifetime, he had moved and changed employment many times. D.C. admitted that since E.C.'s birth in 2009, not including the Johnson County jail, he had lived at nine different locations. The most recent move was a few months prior. In addition, D.C. testified that he and S.C. might have to move again for his job, which was related to the apartment complex he lived in. But he testified that the current apartment was in a good neighborhood. S.C. testified that E.C. would have her own room at this apartment. D.C. admitted that since E.C.'s birth in 2009, he had been employed 10 different times, quitting at least 2 of those jobs before having secured new employment. Currently, D.C. testified that he worked a 40-hour week and made $35 an hour, which included health insurance benefits.

At the close of trial, the parties made their arguments. The GAL joined Grandparents in arguing that the trial court should grant Grandparents' petition because

E.C. was a minor in need of guardianship. The trial court took all parties' arguments under advisement.

The trial court issued an order finding that clear and convincing evidence supported that D.C. was unfit. Highly summarized, the trial court found that D.C. was unfit to parent E.C. because of the following: (1) D.C. was convicted of two aggravated sexual batteries, for which he was required to register as a sexually violent offender; (2) D.C. allowed his immediate family who had sexually violent pasts to have "at least some contact" with his daughters with S.C.; (3) D.C. failed to establish a father-daughter relationship throughout E.C.'s life and during the pendency of the guardianship case; (4) S.C. had no relationship with E.C.; and (5) E.C.'s health, safety, and welfare, particularly her psychological welfare, would be damaged by being placed with D.C. As to this last point, the trial court emphasized D.C.'s history of instability and failure to fully grasp all of E.C.'s mental health needs.

Therefore, the trial court granted Grandparents' petition on the basis that E.C. was in need of a guardian because D.C. was unfit to parent. Nevertheless, citing *In re Guardianship of Williams*, 254 Kan. 814, Syl. ¶ 3, 869 P.2d 661 (1994), the trial court held that "[s]hould an appellate tribunal disagree with this finding of unfitness by the standard of clear and convincing, this Court alternatively finds that this case presents the 'highly unusual or extraordinary circumstances' referred to [in *Williams*.]" Accordingly, the trial court ruled that even if D.C. was fit to parent E.C., this case involved highly unusual or extraordinary circumstances requiring D.C.'s placement with Grandparents under the best interests of a child test.

*Did the Trial Court Err by Granting Grandparents' Guardianship Petition?*

*Applicable Law*

Under K.S.A. 2017 Supp. 59-3059(a)(1), "Any person may file in the district court of the county of residence of the proposed ward . . ., a verified petition requesting the appointment of a guardian . . . , for a minor in need of a guardian . . . ." "The petition shall include: . . . a statement that it is the petitioner's belief that the proposed ward . . . is a minor in need of a guardian . . . ." K.S.A. 2017 Supp. 59-3059(b)(5). This statement must include "the factual basis upon which the petitioner makes that allegation." K.S.A. 2017 Supp. 59-3059(b)(6).

"Upon the filing of a petition as provided for in K.S.A. 59-3059, and amendments thereto, alleging that the proposed ward . . . is a minor in need of a guardian . . . , the court shall issue an order fixing the date, time and place of the trial on the petition." K.S.A. 59-3063(b). At the conclusion of the trial, "[i]f the court finds by clear and convincing evidence that the proposed ward . . . is [a] . . . minor in need of a guardian . . . the court . . . shall appoint a qualified and suitable individual . . . as the guardian . . . ." K.S.A. 2017 Supp. 59-3067(e)(1).

Over the years, there have been very few appellate cases involving guardianships, let alone guardianship cases where third parties seek the guardianship of a minor against the natural guardians. Nevertheless, in *In re Guardianship of H.C.*, No. 105,357, 2012 WL 687074, at *4 (Kan. App. 2012) (unpublished opinion), this court considered the term "minor in need of a guardian" in that context. Significantly, the *In re H.C.* court provided the following analysis:

> "K.S.A. 2010 Supp. 59-3051(f) defines the term at issue here: "'In need of a guardian" means a person who because of both *an impairment and the lack of*

10

*appropriate alternatives for meeting essential needs*, requires the appointment of a guardian.'

"'Impairment' isn't defined, but an 'adult with an impairment in need of a guardian or a conservator, or both' is defined as a person 'whose ability to receive and evaluate relevant information . . . is impaired such that the person lacks the capacity to manage such person's estate, or to meet essential needs for physical health, safety or welfare.' K.S.A. 2010 Supp. 59-3051(a). Presumably, no definition of impairment was provided for a minor based on the legal presumption that a minor's age constitutes the impairment: a minor is presumed to need adult supervision and control.

"But the second requirement to be 'in need of a guardian' is *'the lack of appropriate alternatives for meeting essential needs*,' K.S.A. 2010 Supp. 59-3051(f), which applies to both minors and adults. An 'appropriate alternative' is one that enables a person to 'adequately meet essential needs for *physical health, safety or welfare*, or to reasonably manage such person's estate.' K.S.A.2010 Supp. 59-3051(b). And, according to the statute, "'meet essential needs for physical health, safety or welfare" means making those determinations and taking those actions which are reasonably necessary in order for a person . . . to be provided with *shelter, sustenance, personal hygiene or health care, and without which serious illness or injury is likely to occur*.' K.S.A. 2010 Supp. 59-3051(i)." (Emphasis added.) 2012 WL 687074, at *4-5.

Since the *In re H.C.* decision, the Legislature has not amended the applicable guardianship statutes. Accordingly, the key issue in challenges involving whether a minor is need of a guardian is whether the minor's essential needs are met by the natural guardian. Yet, when courts consider whether to grant a guardianship to a third party because the natural guardian has allegedly failed to meet the minor's essential needs, courts must also consider the parental preference doctrine.

In *Williams*, our Supreme Court explained that the parental preference doctrine applies as long as the court does not find the natural guardian unfit:

"It is a firmly established rule in this state that a parent who is able to care for his or her children and desires to do so, and who has not been found to be an unfit person to

11

have their custody in an action or proceeding where that question is in issue, is entitled to the custody of his or her children as against grandparents or others who have no permanent or legal right to the children's custody, even though at the time the natural parent seeks their custody such grandparents or others are giving the children proper and suitable care and have acquired an attachment for them." 254 Kan. 814, Syl. ¶ 2.

Our Supreme Court then explained that in almost all guardianship proceedings, the best interests of the child test does not apply. *Williams*, 254 Kan. at 826-28. "[A]bsent highly unusual or extraordinary circumstances, the best interests of the child test has no application in determining whether a parent, not found to be unfit, is entitled to custody as against a third-party nonparent." 254 Kan. 814, Syl. ¶ 3. The *Williams* court did not provide an example of what would constitute such a highly unusual or extraordinary circumstance.

Thus, the *Williams* court's holding establishes that in guardianship cases, the court may properly grant petitioners' request for guardianship against parents-natural guardians in two situations: (1) when there is clear and convincing evidence that the natural guardians are unfit; and (2) when there is not clear and convincing evidence that the natural guardians are unfit but some other highly unusual or extraordinary circumstances exist. In all other instances, the trial court must deny the petition for appointment of guardianship.

In *In re Guardianship & Conservatorship of L.M.H.*, No. 108,297, 2013 WL 2395900, at *7 (Kan. App. 2013) (unpublished opinion), this court explained that in guardianship cases, a parent's fitness hinges on his or her ability to provide for the minor's essential needs. Natural guardians are unfit if they cannot provide for one of their minor's essential "physical health, safety, or welfare" needs. The burden of proving parental unfitness always falls on the petitioning party. *In re H.C.*, 2012 WL 687074, at *6 (quoting *Williams*, 254 Kan. at 828).

12

Next, while reviewing a trial court's guardianship decision, this court has exercised the following standard of review:

"[W]e recognize an appellate court owes great deference to the factual findings of a district court and generally will not disturb them, especially when they rest on credibility determinations. By statute, in an action tried to the district court, '[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.' K.S.A. 60-252. Only a finding without any substantial support in the evidence may be rejected as clearly erroneous. See *In re Estate of Bolinder*, 19 Kan. App. 2d 72, 74-75, 864 P.2d 228 (1993) (substantial evidence would permit a reasonable person to accept the conclusion it supports), *rev. denied* 254 Kan. 1007 (1994). As the Kansas Supreme Court has pointed out: 'In evaluating the evidence to support the district court's factual findings, an appellate court does not weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact.' *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009)." *L.M.H.,* 2013 WL 2395900, at *6.

But to the extent this appeal involves interpreting the guardianship statutes, statutory construction involves a question of law over which this court has de novo review. *Neighbor v. Westar Energy, Inc.,* 301 Kan. 916, 918, 349 P.3d 469 (2015).

Last, it is a rule of this court to uphold the trial court's decision, even if it relied upon the wrong ground or assigned the wrong reasoning, so long as it reached the correct legal conclusion. *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015). As a result, even if the trial court made some errors below, this court may affirm the trial court's rulings if those ultimate rulings were correct.

*Minors' Essential Needs Include Their Mental Health Care Needs*

D.C. argues that Grandparents' petition failed to state a claim upon which relief could be granted because their petition never stated that D.C. could not provide for E.C.'s essential needs. He notes that Grandparents' petition alleged that "E.C. would be psychologically damaged if [he] took custody." He further notes that the petition focused on his "shortcomings in character." D.C. specifically argues that a minor's essential needs does not "encompass mental health considerations." Grandparents, however, allege that they stated a claim upon which relief could be granted because their petition included the following allegations: (1) that E.C.'s placement with D.C. would be "psychologically damaging" "given the death of [her] mother," (2) that D.C. was incapable of parenting E.C. as shown by his lack of relationship with E.C., and (3) that D.C. was a registered sex offender.

Dismissal for failure to state a claim under K.S.A. 2017 Supp. 60-212(b)(6) is permissible only when the allegations in plaintiff's petition establish that plaintiff does not have a valid claim. *Knop v. Gardner Edgerton U.S.D. No. 231*, 41 Kan. App. 2d 698, 702, 205 P.3d 755 (2009). If, in the light most favorable to the plaintiff, the petition states any valid claim for relief, the motion to dismiss should be denied. 41 Kan. App. 2d at 702.

Here, D.C. argues that because K.S.A. 2017 Supp. 59-3051(i) addresses only the "physical health" of a proposed ward, the trial court erred when it concluded that the previously cited subsection was broad enough to include a proposed ward's psychological needs. As a result, D.C. asserts that the trial court violated the plain meaning of K.S.A. 2017 Supp. 59-3051(i) when it expanded the subsection to include a proposed ward's psychological needs. We disagree. Can physical health say to the brain I have no need of you or say to the brain you have no part in physical health? Of course not. The human

14

body has many parts. Nevertheless, the many parts make up the physical health of the body.

Indeed, the United States Supreme Court has recognized inmates' claims against prisons for not providing adequate mental health treatment. The Court held that treatment of mental health constitutes a basic part of health care. *Brown v. Plata*, 563 U.S. 493, 501-02, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011).

Furthermore, states must provide mental health services to children who are in need of such services because these services are covered by the Medicaid Act. Medicaid Act, § 1905(r), 42 U.S.C. § 1396d(r) (2016); see also *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 29 (D. Mass. 2006). Indeed, 42 U.S.C. § 1396d(r)(1)-(5) (2016) of the Medicaid Act states that persons under the age of 21 are entitled to medical assistance that includes early and periodic screening, diagnostic, and *the treatment* of mental illnesses. Therefore, the United States Congress has enacted legislation mandating that states provide low-income children with mental health treatment.

K.S.A. 2017 Supp. 59-3051(i) states that minors' essential needs are "physical health, safety, and welfare" as they relate to "shelter, sustenance, personal hygiene or *health care*." As indicated by the *Brown* case and the Medicaid Act, mental health needs are health care issues. Moreover, as stated by the Medicaid Act, all children are entitled to the treatment of their mental health needs. Accordingly, we can read K.S.A. 2017 Supp. 59-3051(i) as saying that minors' essential needs include their safety and welfare as it relates to their mental health care needs. In turn, if a natural guardian cannot meet a minor's essential safety and welfare needs as it relates to that minor's mental health care needs, that minor would be a minor in need of a guardian under the guardianship statutes.

Thus, it is readily apparent that when a third party alleges that a natural guardian cannot provide the care required for the minor's mental health needs, the third party has

15

raised a valid claim entitling them to relief under the guardianship statutes. Certainly, in this case, where Grandparents have alleged that D.C. would actually aggravate E.C.'s mental health issues if she was placed in his custody, Grandparents have stated a claim entitling them to relief.

Moreover, in *In re Adoption of Baby Boy L.*, 231 Kan. 199, 212-13, 643 P.2d 168 (1982), our Supreme Court held that a parent may be unfit when the *physical well-being* of the child could be endangered if placed in the parent's custody. Similarly, K.S.A. 2017 Supp. 59-3051(i) states that a minor's physical health constitutes an essential need. Although the *Baby Boy L.* court and K.S.A. 2017 Supp. 59-3051(i) references to the minor's physical well-being, the link between a person's mental and physical well-being is undeniable. For instance, Steiner testified the specific maladaptive behaviors he was concerned E.C. might develop if placed with D.C. included self-harm and runaway behavior. These are physical manifestations of a mental health condition. The act of self-harming could result in the deterioration of a minor's physical health. Additionally, if a minor should run away from home, it is very likely that *none of the minor's essential "shelter, sustenance, personal hygiene and health care" needs will be met*. As a result, it is no great leap that a parent may be unfit when the parent cannot provide for the minor's *mental or psychological well-being*.

In summary, Grandparents' petition stated a claim upon which relief could be granted. Therefore, regardless of the trial court's reasoning for denying D.C.'s motion for failure to state a claim upon which relief could be granted below, the trial court correctly denied D.C.'s motion.

*The Trial Court Applied the Parental Preference Doctrine*

Next, D.C. argues that because the trial court found this case to be one where highly unusual or extraordinary circumstances existed, the trial court did not apply the

16

parental preference doctrine; instead, it applied the best interests of a child test. Because D.C. alleges that the trial court did not apply the parental preference doctrine, he believes that the trial court's rulings were errant and must be reversed. In short, D.C.'s argument fails to take into account that the trial court's highly unusual or extraordinary circumstances finding was in the alternative to its parental unfitness finding.

After addressing the current state of guardianship law as outlined in *In re H.C.*, the trial court found that clear and convincing evidence supported that D.C. was unfit to parent for many reasons. The trial court granted Grandparents' petition for guardianship specifically because it found D.C. "unfit to parent [E.C.]" Only after making the unfitness finding, did the trial court state that "[s]hould an appellate tribunal disagree with [its] finding of unfitness by the standard of clear and convincing, [it] *alternatively* [*found*] that [the] case present[ed] the 'highly unusual or extraordinary circumstances' referred to in [*Williams*]."

In fact, we further note that it is patently obvious the trial judge applied the parental preference doctrine in this case because the trial judge explicitly stated that it was applying the doctrine even though it believed that the doctrine should not apply in guardianship cases. Although we do not approve of the trial judge's inclusion of his personal opinions on the parental preference doctrine in his order, D.C. has not complained about the trial judge's actions on appeal. Consequently, if D.C. had any complaints about the trial court's partiality, he has abandoned them by not raising them on appeal. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Thus, what remains is the trial judge's explanation that he did apply the parental preference doctrine.

Accordingly, any argument that the trial court did not apply or consider the parental preference doctrine is clearly incorrect. To the extent that the trial court found

17

that this case involved highly unusual or extraordinary circumstances, we determine that this was simply an alternative finding.

*The Trial Court's Essential Needs Finding Was Supported by Clear and Convincing Evidence*

D.C.'s final argument is that clear and convincing evidence did not support the trial court's finding that E.C. was a minor in need of a guardian because he was unfit. D.C. begins by pointing out that at trial, he provided evidence that he could provide E.C. with shelter and sustenance, and provide for her physical health. D.C. then alleges that the trial court burden shifted. D.C. argues that because he could provide for E.C. in this way, the trial court's finding that he was unfit must be erroneous. Last, D.C. emphasizes that Grandparents' "evidence was principally related to what they perceive[d as his] past shortcomings and character flaws." He argues that such evidence was insufficient to show that he was unfit.

Grandparents merely respond that clear and convincing evidence supported each of the trial court's findings that E.C. was a "minor in need of a guardian" because of D.C.'s unfitness.

Regarding D.C.'s argument that the trial court had to find him fit because he provided evidence that he could meet some of E.C.'s essential needs, D.C.'s argument hinges on misinterpreting the plain language of K.S.A. 2017 Supp. 59-3051(i). Again, K.S.A. 2017 Supp. 59-3051(i) defines "[m]eet essential needs for physical health, safety or welfare" as "making those determinations and taking those actions which are reasonably necessary in order for a person to obtain or be provided with shelter, sustenance, personal hygiene or health care, and without which serious illness or injury is likely to occur."

18

In making his argument, D.C. seems to imply that because he presented evidence that he could provide E.C. with shelter and sustenance, and provide for E.C.'s physical health, the trial court could not find him unfit. Yet, the use of the conjunction "or" in K.S.A. 2017 Supp. 59-3051(i) shows the Legislature's "intent to state alternatives." See *In re Adoption of H.C.H.*, 297 Kan. 819, 837, 304 P.3d 1271 (2013). Thus, in this case, because E.C.'s "essential needs for physical health, safety *or* welfare" included whether D.C. could provide E.C. with "shelter, sustenance, personal hygiene *or* health care, and without which serious illness *or* injury [was] likely to occur," the trial court could find D.C. unfit even if D.C. had established that he met some of E.C.'s essential needs.

This final point is important because a guardianship may be established if a parent is incapable of meeting any one of a minor's essential needs. Consequently, as long as one of the trial court's findings why E.C. constituted a minor in need of a guardian because of D.C.'s unfitness is supported by clear and convincing evidence, we can affirm the trial court's granting Grandparents guardianship over E.C.

With this established, we first note that it seems the trial court failed to follow the plain language of the statute defining what constitutes a minor's essential needs. Once more, K.S.A. 2017 Supp. 59-3051(i) states: "'Meet essential needs for physical health, safety or welfare' means making those determinations and taking those actions which are reasonably necessary in order for a person to obtain or be provided with shelter, sustenance, personal hygiene or health care, and without which serious illness or injury is likely to occur." As noted by the *L.M.H.* court, based on the plain language of K.S.A. 59-3051(i), whether parents are unfit because they cannot meet their children's essential needs must be judged by the parents' "*present ability* to provide the essentials of a place to live, food, health care, and a demonstrably safe overall environment." (Emphasis added.) 2013 WL 2395900, at *7. It can also be judged by parents' *present ability* to provide "some measure of nurturing and guidance." (Emphasis added.) 2013 WL

19

2395900, at *7. If a parent cannot presently provide one of these necessities, then the parent is unfit for guardianship purposes. 2013 WL 2395900, at *7.

Below, the trial court found that D.C. was unfit to parent E.C. because of the following: (1) D.C. was convicted of two aggravated sexual batteries, for which he was required to register as a sexually violent offender; (2) D.C. allowed his immediate family who had sexually violent pasts to have "at least some contact" with his daughters with S.C.; (3) D.C. demonstrated no father-daughter relationship throughout E.C.'s life and during the pendency of the case; (4) S.C. had no relationship with E.C.; and (5) E.C.'s health, safety, and welfare, particularly her psychological welfare, would be damaged by being placed with D.C. Grandparents have asked this court to find that all of the trial court's findings were supported by clear and convincing evidence. Nevertheless, as D.C. has correctly pointed out in his brief, many of the trial court's findings of unfitness were unrelated to whether he could meet E.C.'s essential needs as stated under K.S.A. 2017 Supp. 59-3051(i).

For example, although D.C.'s criminal history and apparent ambivalence to allowing his sex offender relatives around his children is concerning, it is difficult to see how these facts relate to D.C.'s ability to provide for E.C.'s physical health, safety, or welfare, as it relates to providing her with shelter, sustenance, personal hygiene, and health care. Indeed, except for his findings about D.C.'s ability to care for E.C.'s mental health needs, the trial court did not make its unfitness finding based upon D.C.'s ability to provide for E.C.'s essential needs. Instead, the trial court found D.C. unfit based on definitions of parental unfitness from the case *Sheppard v. Sheppard*, 230 Kan. 146, 153, 630 P.2d 1121 (1981), *cert. denied* 455 U.S. 919 (1982). It seems the trial court relied on *Sheppard* because the *In re H.C.* court quoted *Sheppard* while determining whether the trial court in its case correctly *terminated* the parent's rights. Yet, in this case, Grandparents never petitioned the court to terminate D.C.'s parental rights. Moreover, the trial court did not attempt to terminate D.C.'s parental rights. In fact, after finding D.C.

20

unfit, the trial court ordered that "D.C. [have] the opportunity to continue contacts with [E.C.]" In short, it seems the trial court conflated the law concerning whether a parent is unfit for the purpose appointing a third-party guardian and whether a parent is unfit for the purpose of terminating that parent's parental rights.

Regarding D.C.'s burden shifting arguments, we find these arguments unpersuasive. On appeal, D.C. asserts that the trial court burden shifted when it did the following: (1) when the trial court found that D.C. "failed to offer any photographic evidence of contacts with [E.C.]" upon the GAL's request; (2) when the trial court found that D.C. "offer[ed] no evidence to rebut the position of [Grandparents] and of GAL that granting the guardianship as requested [would be in E.C.'s] best interests" as it concerned her mental health; and (3) when the trial court found that it was "not persuaded by [his] attempts to extend his current apparent fitness to parent his two daughters at home to a demonstration of fitness to parent [E.C.]."

Nevertheless, even if D.C.'s argument had some merit, so long as the trial court reached the correct result, we can uphold a trial court's ruling despite the fact that the trial court relied upon the wrong grounds or assigned erroneous reasons for its decision. *Gannon*, 302 Kan. at 744. Notwithstanding the preceding, the trial court found that "Petitioners have sustained their burden to demonstrate by clear and convincing evidence that [D.C. was] unfit to parent [E.C.]" based on facts presented at trial. These facts included facts about the lack of a father-child relationship with E.C., lack of stability, and refusal to adjust to E.C.'s mental health needs. Importantly, these are undisputed facts that the trial court relied on in finding that clear and convincing evidence supported that D.C. was unfit because he was incapable of adequately caring for E.C.'s mental health needs.

Moreover, those facts establish that D.C. was unfit because he was incapable of adequately caring for E.C.'s mental health needs. The trial court explicitly found that "E.C.'s health, safety, and welfare *would* be damaged should she be placed with D.C."

21

The trial court also found that "[D.C. did] not afford [E.C.] a sufficient degree of stability and security, thus further damaging [E.C.'s] health, safety, and welfare." It specifically found that should E.C. be placed with D.C., there was a "reasonably" likely chance that she would develop maladaptive behaviors like a desire to self-harm or run away.

In making those findings, the trial court emphasized Steiner's testimony that E.C. would likely suffer "extreme psychological harm" by being removed from Grandparents' home, the only living caretakers she had ever known. The trial court emphasized Steiner's testimony that E.C. needed as much *stability* in her life as possible. It also emphasized Steiner's testimony that E.C. was already having difficulties processing her mother's death as well as E.C.'s overall behavior issues. Then, the trial court contrasted Steiner's recommendations with D.C.'s lifestyle. The trial court pointed out that D.C. had moved numerous times over E.C.'s lifetime and that D.C. and S.C. might move again. The trial court pointed out that D.C. intended to make E.C. change schools. Moreover, he planned to do it during the school year. Additionally, the trial court pointed out that when confronted with Steiner's recommendation, D.C. "demonstrated no concern for [E.C.'s] needs and simply indicated that because he is her biological father, [E.C.] should live with him regardless of any other factors."

At this juncture, it is important to repeat that this court will not disturb the trial court's factual findings so long as they are not clearly erroneous, meaning they have no substantial support in the evidence. *L.M.H.*, 2013 WL 2395900, at *6 (*quoting Hodges*, 288 Kan. at 65.) Moreover, as previously discussed, a minor's mental health needs fits within the meaning of their essential "physical health, safety, or welfare" needs as it relates to providing the minor with "shelter, sustenance, personal hygiene or *health care*" (1) because mental health issues are health care issues and (2) because the symptoms of mental health manifest in a person's physical health. Thus, courts may find a natural guardian unfit if the natural guardian cannot "tak[e] those actions which are reasonably

22

necessary" to meet a minor's essential mental health needs. See K.S.A. 2017 Supp. 59-3051(i).

Here, each of the trial court's factual findings were based on trial testimony. Thus, the trial court's fact findings were substantially supported by the evidence. Moreover, the trial court's factual findings supported that D.C. was unfit because he could not care for E.C.'s essential mental health needs. Taken as a whole, D.C.'s testimony showed that he could not provide E.C. with the stability she required for her mental health. His history of inconsistent visitations with E.C., even during the duration of the guardianship case, indicated that E.C.'s overall needs would not be paramount. Clearly, E.C. needed increased contact with D.C., as well as S.C. and her two little sisters, should she ever feel mentally stable living away from her grandparents and with D.C. Yet, D.C. showed no initiative to create this very important relationship with E.C.

Likewise, D.C.'s testimony that if granted custody, he would make E.C. change schools a minimum of two times in the upcoming year, as well as potentially not allow her to continue her relationship with her Grandparents, established that E.C.'s very basic mental health needs would not be paramount either. E.C. was struggling but settled at her current school. But S.C. testified that they intended to put E.C. in the school that was "not very far" from their apartment, which would close at the end of the year. Thus, even though it was near the end of the school year, and E.C. was already settled in her current school, D.C. intended to make E.C. move to a school she would be in for a matter of several weeks seemingly because the location was convenient.

Additionally, Steiner clearly testified that E.C.'s continued relationship with Grandparents was incredibly important to her mental health. Yet, at trial, D.C. denied Steiner said this. Moreover, when Grandparents questioned D.C. what his plan was should the trial court deny their petition, D.C. testified that he had not decided what he was going to do concerning visitation with Grandparents because it was "a matter of [*his*]

23

feelings with [*his*] daughter seein' her grandparents . . . ." Simply put, D.C. was actively choosing to ignore the testimony of what was best for E.C.'s mental health needs. D.C.'s testimony further established that he was placing his own wants before his child's needs.

As a result, it is readily apparent that D.C. could not provide for E.C.'s mental health needs.

On appeal, D.C.'s overarching argument has been that under K.S.A. 2017 Supp. 59-3051(i), he has no duty to provide for E.C.'s mental health because it does not constitute an essential need. As considered, however, D.C.'s testimony also reflected this sentiment. D.C. was willing to provide shelter and sustenance for E.C., and he would even care for her physical health. But E.C. would have to adjust to D.C.'s way of life—a life away from Grandparents, with school changes, and a father, stepmother, and siblings she barely knew. E.C. would have to make this adjustment whether this adjustment was beneficial for her mental health needs or not. In summary, we find that *parents who either cannot or will not adjust to their children's mental health needs do not have the present ability to provide for their children's health needs.*

Consequently, clear and convincing evidence supported the trial court's parental unfitness finding as it pertained to D.C.'s ability to care for E.C.'s essential mental health needs. In turn, the trial court properly granted Grandparents' petition for guardianship. Because D.C. was unfit, we do not need to address the trial court's alternative finding that this case characterized the "highly unusual or extraordinary circumstances" addressed in *Williams.* 254 Kan. 814, Syl. ¶ 3.

Affirmed.